**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Craig Dwayne Justice, | No. CV-18-03144-PHX-RCC (EJM) |
| Petitioner, | **REPORT AND RECOMMENDATION** |
| v. | |
| David Shinn, et al., | |
| Respondents. | |

Petitioner Craig Dwayne Justice filed an amended pro se Petition for Writ of Habeas Corpus ("PWHC") pursuant to 28 U.S.C. § 2254 on February 19, 2019. (Doc. 7).[1] Petitioner raises six grounds for relief: (1) actual innocence in violation of the Fifth, Sixth, and Fourteenth Amendments; (2) ineffective assistance of trial counsel in violation of the Fifth, Sixth, and Fourteenth Amendments; (3) prosecutorial misconduct in violation of the Fifth, Sixth, and Fourteenth Amendments, the Arizona Constitution, and rules of professional conduct and ethical responsibilities; (4) denial of Petitioner's right to confront witnesses in violation of the Fifth, Sixth, and Fourteenth Amendments; (5) violation of Petitioner's due process rights and rights under the Fifth, Sixth, and Fourteenth Amendments; and (6) ineffective assistance of appellate counsel in violation of the Fifth, Sixth, and Fourteenth Amendments, and the Arizona Constitution.[2]

Respondents filed an Answer contending that some of Petitioner's claims are not

---

[1] The original PWHC was filed on October 3, 2018. (Doc. 1).
[2] Petitioner also presents multiple sub-claims, which will be addressed in more detail below.

cognizable on habeas review, that some claims are unexhausted and/or procedurally defaulted without excuse, and that the remaining claims lack merit. (Doc. 14). Respondents request that the Court deny and dismiss the PWHC with prejudice.

Petitioner filed a Reply rearguing the issues in his PWHC and alleging that he has shown cause and prejudice to excuse the procedural default of his claims. (Doc. 17). Petitioner requests copies of the grand jury transcripts and documents relating to probable cause and the supervening indictment, discovery under Rule 6, and an evidentiary hearing pursuant to Rule 8. *Id.* at 3–4; *see* Rules Governing § 2254 Cases. Petitioner requests that the Court conduct a de novo review of his case and asserts that all issues raised in the lower courts should be viewed as not defaulted or unexhausted. *Id.* at 59.

Pursuant to Rules 72.1 and 72.2 of the Local Rules of Civil Procedure, this matter was referred to Magistrate Judge Markovich for a Report and Recommendation. The undersigned finds that several of Petitioner's claims fail to state a cognizable claim for habeas relief. The undersigned further finds that several of Petitioner's claims are procedurally defaulted and barred from this Court's review, and that Petitioner does not demonstrate cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default of his claims. Finally, as to Petitioner's claims that are cognizable, properly exhausted, and not defaulted, the undersigned finds that Petitioner has failed to show that the state court's determination of the claims was contrary to or based on an unreasonable application of clearly established federal law, or based on an unreasonable interpretation of the facts. Accordingly, the Magistrate Judge recommends that the District Court deny the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Trial, Sentencing, and Appeal

On April 13, 2012 Petitioner was indicted by a Maricopa County grand jury on one count of second-degree murder, a class one dangerous felony, and one count of leaving the scene of a fatal injury accident, a class two felony. (Ex. A).[3] The trial court subsequently

---

[3] All exhibit numbers refer to the exhibits attached to Respondents' Answer unless otherwise noted. All page numbers refer to the page of the document as filed in CM/ECF.

granted Petitioner's motion to remand for a new finding of probable cause (Ex. C), and a remand indictment issued on August 20, 2012 (Ex. D).

On August 29, 2013 the jury found Petitioner guilty of second-degree murder and leaving the scene of a fatal injury accident. (Ex. W at 1293–94). On December 6, 2013 Petitioner was sentenced to a presumptive term of 16 years for the second-degree murder conviction and a consecutive, presumptive term of 9.25 years for leaving the scene of the accident. (Exs. Y and Z).

The Arizona Court of Appeals summarized the background of Petitioner's case as follows:[4]

> On the morning of the collision, Defendant and his wife were driving home from a party at a friend's house at which Defendant had been drinking.[5] On the drive home, Defendant was involved in a traffic altercation with two men in a pickup truck.[6] Darrin, the driver of the truck, admitted that he had also

---

[4] While the appellate court's stated facts are entitled to the presumption of correctness, *see* 28 U.S.C. § 2254(e)(1); *Runningeagle v. Ryan*, 686 F.3d 758, 763 n.1 (9th Cir. 2012), the undersigned finds that the COA's description is inadequate to fully explain the State's and Petitioner's theories at trial and the evidence in support of those theories. Thus, the undersigned has added additional notes to further elucidate the factual background.

[5] Petitioner's wife, Shirley Chavez, testified that she was driving because Petitioner had been drinking and didn't have a license. (Ex. R at 904:10–15). On the way home she saw a body laying across the road on Pueblo near 97th Street. *Id.* at 906:12–14. There was a dark-colored truck parked on the curb with the driver's side door open and a man in the driver's seat. *Id.* at 907:5–7. Petitioner rolled down the window and said, "Are you alright?", then got out of the car to help. *Id.* at 907:25–908:4. The man on the ground got up and started swinging at Petitioner, and the man in the truck got out and tried to get in Shirley's car. *Id.* at 908:5–9. Petitioner told Shirley to "get the hell out of there" and she drove towards 96th Street and passed a red car. *Id.* at 908:13–19. Shirley made a U-turn and tried to go around the red car twice but it stopped her; once the red car turned, Shirley turned and went back to the fight scene. *Id.* at 909:1–11. Petitioner, the other men, and the truck were all gone. *Id.* at 909:12–17. Shirley then drove down Pueblo towards Ellsworth with her windows down, calling out for Petitioner, and a tire rolled past her. *Id.* at 910. When she got to Ellsworth, she saw the same pickup truck from the fight scene; she stopped and called for Petitioner and heard him say "they run me over." *Id.* at 911:15–19. Shirley found Petitioner on the ground in front of the truck's driver's side fender; his leg was bent up beside him with his foot under his neck and he had blood on his face and leg. *Id.* at 912. She did not hear a crash and did not see any other vehicles in the area; she got tunnel vision and just saw Petitioner was hurt and wanted to get him to the hospital. *Id.* at 912, 936–37. Shirley told Petitioner to get up and he said, "I have no leg." *Id.* at 913:21–23. Shirley hopped him up on his other leg and got him to her car. *Id.* at 913:24–914:2. The only other person she saw at the scene was a woman in a long white gown who "looked like an angel." *Id.* at 914:8–10. The woman did not say anything to her, but Shirley heard the woman giving her license plate number, and Shirley said, "Good. Please tell them we're going to the hospital." *Id.* at 914:10–14. Shirley denied that she drove towards home; she went to the hospital. *Id.* at 915:10–18.

[6] The two men were identified as Darrin Medina and Kendrick John, also known as "KJ."

- 3 -

been drinking. According to Darrin, he and Defendant got out of their vehicles and argued in the street, then Defendant hit him in the mouth and fractured his jaw before driving off in Darrin's truck,[7] leaving Darrin and his friend at the scene.[8] Defendant was driving the truck when, minutes later, he ran a stop sign approximately half a mile away and hit an SUV, killing the driver.[9]

_____

(Ex. M at 385; 398).

[7] Deputy Whelan spoke with Petitioner at the hospital and testified that Petitioner explained the fight as follows: Petitioner and his wife were driving and found two men laying in the street and stopped to help. A racial misunderstanding occurred, the men began to hit him, and Petitioner hit back. Then Petitioner got into their truck because he noticed his wife had left him, and then he was pulled from the truck. Petitioner denied ever driving the truck. (Ex. S at 1101–02, 1103–04). Petitioner "explained that he had attempted to get into the black truck and drive away and he had been pulled from the truck and he was unsure whether the truck was moving or not and if that truck had actually run him over." (Ex. N at 439:10–14). Deputy Whelan stated that Petitioner was being triaged and moved to another hospital and could not provide further details; Petitioner was "banged up" and "wasn't sure of much." Id. at 439:16–24.

[8] Medina testified that he was driving home from the bar with KJ. (Ex. N at 446). As they were headed west on Pueblo, another car cut him off and stopped in front of him. Id. at 447. A male got out from the driver's side, Medina said "a bucket of words," the other man hit Medina, and Medina lost consciousness. Id. at 447–48. Medina woke up and saw KJ getting out of the truck and the other man jumped in his truck and took off. Id. at 449; 464. Medina doesn't know what happened to the other car but remembered the other man getting in his truck and taking off straight forward. Id. That was the last time he saw his truck. Id. at 455. Medina blacked out again and woke up when KJ and a police officer were trying to get him out of the street. Id. at 450. Medina told the police that somebody punched him and took his truck. Id. at 451. He had no memory of anything that happened after he saw the person drive off in his truck until the cops were getting him off the street. Id. at 467. Medina did not get a good look at the other car and did not remember anything about the car or the person who got out of it. Id. at 447–49; 464.

Deputy Antwiler testified that when he arrived at 96th and Pueblo, he found a white female with blond hair and two Native American men in the road. (Ex. M at 381). One man was trying to pull the other man off the ground. Id. The woman said she found the men like that and didn't know anything about what happened and was just trying to render assistance. Id. at 384. Before Deputy Antwiler got to Pueblo, he passed a white car that was stopped on the side of the road on 96th Street. Id. at 382–83. He only briefly paid attention to the car because he was focusing on the male subjects that were injured and intoxicated. Id. at 384.

Deputy Whelan testified that when he arrived at 96th and Pueblo, he found two males in the road with Deputy Antweiler and Deputy Maclyn. (Ex. N at 425). The police dispatcher advised that there was an open phone line thought to be related to the call about the fight scene. Id. Deputy Whelan asked the men for their phones; one man gave him his phone and Deputy Whelan determined it was not the open line. Deputy Whelan got more information from the dispatcher that the phone was pinging near Chrisman and Baseline and traveled that direction. Id. at 426. He expected to find a white vehicle but instead saw a small red passenger car; it was the only car on the road. Deputy Whelan stopped the car, briefly looked at it and did not see any damage to it, and spoke to the occupants, who did not look like they had been in a fight. They said that they had come across the fight scene and called it in; the female occupant, Cheryl Laughlin, reached in her purse and realized her phone was still on. Id. at 426–28.

[9] The defense theory at trial was that the evidence showed Medina, not Petitioner, was more likely than not the driver at the time of the fatal injury accident. (Ex. M at 319; Ex. P at

A witness who lived near the intersection heard the crash and immediately called 911.[10] She saw "two people in front of the truck[11] leaving." The witness asked the man and woman, if anyone was hurt, but they did not respond. The witness also saw a white car "on the other side," facing in the opposite direction of the pickup truck, and saw a "blonde woman" getting the man into the back passenger door of the car before the woman "went round to the driver's side" and "accelerated" away. The man appeared to have some difficulty in getting into the car, and the witness heard the woman telling the man to get in. The car drove off while the passenger door was still open. As the car went down the street, the witness saw the woman turn her right blinker on "like she was going to take a right turn," but then the woman turned her lights off and turned left. The woman also did not stop at a stop sign, just went through it. The car was headed in the direction of the trailer complex in which Defendant lived at the time. All this time, the witness was on the telephone with 911, describing events and relaying the license plate number of the white car.

Based on the 911 call, police broadcasted a description of a white Lincoln that had been seen leaving the scene as well as a description of its occupants. Shortly thereafter, police received a report that a "hit-and-run" victim had arrived at a nearby hospital. A Maricopa County Sheriff's deputy drove to the hospital and located the white Lincoln parked in the parking lot. He also found Defendant, who was being treated for several injuries including a "large 5 centimeter long, mildly displaced and comminuted right mid-femoral shaft fracture" and a "curvilinear laceration on the right forehead."[12] Defendant

---

710).

[10] The witness who lived near the intersection of South Ellsworth and Pueblo, where the accident occurred, was Karin Copeland. She testified that she called 911 to report the car accident. (Ex. M at 324–25). The truck was in her front yard and she saw two people right in front of the truck leaving. *Id.* at 328–29. Right on the other side, she saw a white car with the back-passenger door open. *Id.* at 329. Karin asked the people if they were ok, but the woman did not respond. *Id.* at 329; 337. Karin saw the woman get the man to the back-passenger door and then the woman went to the driver's side and was yelling "get in." *Id.* at 330. Karin was reading the license plate to the 911 operator when the car drove away with the back door still open. *Id.* The driver turned on the right blinker, then turned off the lights and turned left. *Id.* at 331. Karin didn't get a good look at the people, but the woman was blond and shorter than the man. *Id.* at 336. The man seemed to be in great pain and like he was confused about how to get into the car. *Id.* at 336–38.

[11] Deputy Miner testified that he and Sergeant Judd were the first officers to arrive at the accident scene. (Ex. M at 347). He observed a white SUV in Karin Copeland's driveway and a dark-colored truck in the yard and partially on Pueblo. *Id.* at 347–48.

[12] The parties stipulated to Petitioner's and Medina's injuries: Medina had fractures through the right and left mandibular, a sinus fracture, two lacerations on his lips, and swollen lips. (Ex. K). Petitioner had a fractured femur, a large abrasion and large laceration on his forehead, a small laceration on his eyebrow, and a concussion. (Ex. L).

DNA testing showed Petitioner's blood was found on the truck's driver's side door, driver's side headrest, center console, and deployed driver's side airbag. (Ex. O at 576:25–577:1, 581:13–20). Detective LaBenz testified that the bloodstain on the airbag could have only been deposited after the collision when the airbag deployed. (Ex. P at 692:20–22). It was not the normal pattern you would expect to see with an airbag deployment; it was one

gave the deputy several versions of events. He first stated that he had stopped to render assistance to the two men in the truck but that a "racial misunderstanding" occurred and that they proceeded to hit him and he fought back. He also told the deputy that he had hit both of them and gotten into their truck because his wife had left him and driven off in their white car. He then stated that someone pulled him out of the pickup truck and ran him over with it.[13] However, when the deputy explained that the truck was found half a mile from the location of the initial altercation, Defendant denied driving the truck. Defendant's Blood Alcohol Content was between .146 and .174 percent within two hours of driving.

Defendant did not testify at trial, but his wife testified and maintained that they had been the subject of an attempted car-jacking by the men in the pickup truck and that Defendant sustained his injuries when he was run over by them. She maintained that she never saw the SUV and was unaware of any collision. She testified that the only reason they left the location where the woman was on the telephone was to take Defendant to the hospital because he needed immediate medical attention.

(Ex. DD at 1489–1510).

Following his conviction, Petitioner sought review in the Arizona COA. (Ex. AA). Appointed counsel filed a brief arguing that Petitioner's rights to a fair trial and due process under the Arizona Constitution and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were violated because: (1) it was reversible, fundamental error to admit Petitioner's felony conviction, parole status, and violation of parole without any limiting instruction; and (2) failure to give a limiting instruction was fundamental error.

---

droplet of blood instead of an impact-type pattern. *Id.* at 725:11–16; *see also* Ex. R at 999. Detective LaBenz and Detective Wright testified that there was no evidence of blood in the backseat. (Ex. O at 695:5–16, 725:20–22, 829:2–11). A bloodstain on the passenger door was not tested. *Id.* at 725:17–19.

Detective Wright testified that, from his review of the evidence and medical records, Petitioner, but not Medina, had injuries consistent with the damage to the truck and consistent with Petitioner being in the driver's seat. (Ex. P at 819–32). Petitioner's expert, Harry Ryon, testified that Medina, not Petitioner, had airbag-type injuries. (Ex. R at 990–91, 1014–15; Ex. S at 1080, 1083). Ryon "was very convinced beyond a reasonable scientific certainty that [Petitioner] was not driving the vehicle at the time of the impact[,]" and that it was "more likely that Mr. Medina was because of the severity of his facial injuries." (Ex. R at 1016:16–21). There was "also a possibility that somebody else could have been driving that truck . . . because not all of the evidence was collected." *Id.* at 1016:21–1017:3.

[13] On cross-examination, Harry Ryon testified that Petitioner's contention that he was a pedestrian was not a plausible explanation for this incident—Petitioner could have been a pedestrian that was hit, then put into the truck, then taken back out, but it was not plausible. (Ex. S at 1070:14–24).

- 6 -

(Ex. BB).

On July 23, 2015 the COA issued its decision affirming Petitioner's convictions and sentences. (Ex. DD). The court first explained the course of events that led to Petitioner's parole status being introduced at trial and noted that when the trial court ruled the evidence admissible, the court advised Petitioner's counsel that he could ask for a limiting instruction, but counsel did not request one. *Id.* at 1489–92. The COA found that the trial court did not abuse its discretion in admitting the evidence because "[t]he evidence was clearly relevant to explain Defendant's reason for leaving the scene and introduced for the proper purpose of proving Defendant's motive for doing so." *Id.* at 1494. The court further found that the evidence became even more relevant when Petitioner's wife denied that any collision occurred and testified that they left the scene to obtain medical assistance. *Id.* The COA rejected Petitioner's argument that the State used the evidence as improper character evidence to show that he was the type of person who would cause a fatal accident and flee the scene because he was a felon on parole because it was "not borne out by the record[.]" *Id.* at n.3. The court further rejected Petitioner's argument that the evidence was "superfluous" because Petitioner already had enough motive to flee because he was drinking and driving because "the fact that the State may have evidence of other motives does not preclude it from presenting evidence of any one motive even though less prejudicial evidence of motive may exist." *Id.* The court also rejected Petitioner's argument that the evidence was unfairly prejudicial, reasoning that "[w]hile the evidence of Defendant's parole status may have been 'adversely' probative, in the sense that all relevant evidence generally is, it was not unfairly prejudicial in that it did not suggest a decision on an improper basis such as 'emotion, sympathy, or horror.'" *Id.* at 1495 (citation omitted). In addition, the probative value of the evidence as an alternate reason for leaving the scene outweighed potential prejudice, and the trial court instructed the jury that the nature of Petitioner's underlying felony was irrelevant to the case and not something they should consider. Finally, the court rejected Petitioner's argument that the trial court had an "imperative duty" to *sua sponte* give a limiting instruction and that the failure to do so was

reversible, fundamental error. The court noted that the Arizona Supreme Court has "repeatedly held that, if a defendant wants an instruction limiting the effect of certain evidence he must request it, and the failure of the trial court to so instruct is not error in the absence of a request therefor." *Id.* at 1496 (citation omitted).[14] Because the trial court was not required to give a limiting instruction in the absence of a request, Petitioner failed to prove that any error occurred. *Id.* The court therefore affirmed Petitioner's convictions and sentences. *Id.* at 1497.

On August 26, 2015 Petitioner filed a petition for review in the Arizona Supreme Court. (Exs. FF and WWW). Petitioner argued that the admission of his parole status when he did not testify deprived him of a fair trial and due process, citing the Fifth, Sixth, and Fourteenth Amendments and the Arizona Constitution. (Ex. FF at 12). Petitioner contended that this was a reversible abuse of discretion and that the failure to give a limiting instruction was fundamental error. *Id.* at 3. On January 5, 2016 the Arizona Supreme Court denied the petition for review. (Ex. HH). On February 4, 2016 the COA issued its mandate. (Ex. EE).

## B. Rule 32 Petition for Post-Conviction Relief

On October 6, 2015 Petitioner initiated proceedings in Maricopa County Superior Court for Rule 32 post-conviction relief ("PCR").[15] (Ex. II). In his notice, Petitioner indicated that he was making a claim of ineffective assistance of counsel ("IAC") and that there were facts that established by clear and convincing evidence that he was actually innocent. *Id.* Petitioner specifically alleged that Kendrick John's interview placed Medina as the driver of the truck that caused the fatal accident and that John was not subpoenaed

---

[14] The court also noted that experienced defense counsel may consider it good trial strategy to not ask for a limiting instruction.

[15] The Arizona Rules of Criminal Procedure were amended effective January 20, 2020. New Rule 32 applies to defendants convicted after a trial or a contested probation violation hearing, and new Rule 33 applies to pleading defendants and defendants who admitted a probation violation or had an automatic probation violation. Because Petitioner's state court actions were filed prior to January 20, 2020 and he had no state court action pending at the time the new rules went into effect, former Rule 32 applies to Petitioner's case and the Court will cite to former Rule 32 throughout this opinion. *See* Arizona Supreme Court Order R-19-0012, available at: https://www.azcourts.gov/rules/Recent-Amendments/Rules-of-Criminal-Procedure

for trial and his interview was not disclosed. *Id.* On November 2, 2015 Petitioner filed an amended PCR notice and requested counsel. (Ex. JJ). Petitioner alleged that there were facts establishing his innocence by clear and convincing evidence—specifically, exculpatory evidence and witnesses who were subpoenaed but allowed to not show up for trial, and that if this evidence had been produced, it would have created reasonable doubt in the jurors' minds. Petitioner further alleged claims of IAC, due process and compulsory process violations, and prosecutorial misconduct. *Id.* The trial court appointed counsel (Ex. LL), and counsel subsequently filed a notice of completion stating that he was unable to find a tenable issue for relief and requesting that Petitioner be given additional time to file a pro se petition. (Ex. MM).

Petitioner filed a pro se petition on the court provided form and a second, handwritten petition.[16] In his first petition, Petitioner alleged that he was eligible for relief for the following reasons: (1) denial of the constitutional right to representation by a competent lawyer at every critical stage of the proceeding; (2) unconstitutional suppression of evidence by the State; (3) unconstitutional use by the State of perjured testimony; (4) sentence imposed other than in accordance with the procedures established by rule and statute; (5) violation of the Sixth Amendment right to compulsory process for witnesses not at trial; (6) unconstitutional pre-accusation delay; (7) unconstitutional selective prosecution; (8) unconstitutional loss of presumption of innocence; and (9) prosecutorial misconduct violating due process and the right to a fair trial because the State lied to the jury, misrepresented evidence, and failed to complete discovery or produce evidence. (Ex. OO). For the facts in support of his claims, Petitioner wrote that the State caused multiple due process violations, trial and appellate counsel were ineffective, and multiplicity in sentencing. Petitioner further stated that the issues raised in his petition had not been finally decided or raised before because trial counsel was ineffective for failing to properly raise or frame issues in evidentiary proceedings, and appellate counsel failed to raise and

---

[16] The first petition was signed by Petitioner on January 4, 2016 and filed by the clerk on May 13, 2016. (Ex. OO). The second petition was signed by Petitioner on May 2, 2016 and filed by the clerk on May 13, 2016. (Ex. QQ). The trial court deemed the two submissions to be a single petition for PCR. (Ex. RR).

preserve claims.

In his second petition, Petitioner alleged the following claims: (1) the State violated due process and the Fifth, Sixth, and Fourteenth Amendments in a 110-day pre-accusation delay that permitted the State to not completely investigate all available evidence including: (a) blood on the steering wheel, (b) Medina's blood or clothing, (c) a handprint on the car window, and (d) allowing Medina to access his truck and retrieve property, disturbing the evidence, before defense counsel could investigate it; (2) the State selectively prosecuted Petitioner and gave Medina preferential treatment, denying Petitioner equal protection in violation of the Fifth, Sixth, and Fourteenth Amendments, by: (a) not charging Medina with drunk driving, (b) not testing Medina's blood for DNA, (c) not testing Medina's clothing for airbag residue or his clothing or hands for Petitioner's blood, (d) withholding pictures of Medina's injuries from the jury, (e) allowing Medina to disturb and tamper with evidence in the truck prior to any defense examination, and (f) allowing Medina to testify against Petitioner; (3) Petitioner was denied the presumption of innocence in violation of due process and the Fifth, Sixth, and Fourteenth Amendments because the jury received photos of Petitioner handcuffed to the hospital bed and wearing a neck brace but he did not have any neck injuries; (4) prosecutorial misconduct in violation of the Fifth, Sixth, and Fourteenth Amendments because: (a) the State admitted it made mistakes in collecting evidence or completing discovery, (b) the State failed to complete discovery and make disclosures, (c) the State withheld photos of Medina's injuries and allowed perjured testimony, (d) the State failed to disclose Laughlin's 911 tape or a transcript, (e) the State allowed witnesses to be absent from trial without requesting telephonic appearance or following up on a witness's hospitalization, (f) the prosecutor vouched when he excused the officer's mistakes, said the defense presented a smoke and mirrors case, repeatedly referenced Petitioner's parole status to explain why he left the scene of the accident, and presented an unproven and untestified to assumption as to his personal opinion about the events leading up to the accident; (5) the State's agents allowed the mishandling of evidence, depriving Petitioner of a fair trial under the Fifth, Sixth, and

Fourteenth Amendments, when: (a) an officer drove the Lincoln (Petitioner's wife's car) back to the scene of the accident with a bag of Petitioner's bloody clothes in it, (b) the Lincoln and Medina's truck were photographed, transferring blood from vehicle to vehicle, (c) not all areas of blood-transfer were examined, (d) Medina's clothing, blood, hands, and neck burn were not examined, and (e) Medina was allowed tamper with and disturb evidence in his truck; (6) trial counsel was ineffective for: (a) not moving for sanctions for the State's failure to complete discovery and disclose evidence, (b) not addressing the police failure to follow protocol and procedures, (c) failing to protect Petitioner's rights to fair access to the evidence, exhibits, and witnesses, (d) failing to independently collect, test, and examine the evidence, (e) not objecting to Laughlin's absence from trial or requesting a telephonic appearance as an alternative, and (f) not submitting a limiting instruction on Petitioner's parole status; (7) appellate counsel was ineffective, denying Petitioner adequate and effective representation in violation of the Fifth, Sixth, and Fourteenth Amendments for failing to raise issues including: (a) denial of a fair trial, (b) insufficient evidence to support the verdict, (c) denial of compulsory process because Laughlin and John did not testify at trial, (d) prosecutorial misconduct for withholding the recording of Laughlin's 911 call, vouching for officers' mistakes as excusable, stating the defense presented a smoke and mirrors case, repeatedly referring to Petitioner's parole status in rebuttal closing arguments, and failing to investigate Medina's injuries and submit photographs, (e) loss of presumption of innocence from photographs showing Petitioner handcuffed and in a neck brace, and (f) the trial court sentenced Petitioner to multiple punishments under a single prosecution when concurrent terms should have been imposed; and (8) the trial court sentenced Petitioner to consecutive prison terms as multiple punishments for a singular prosecution when governing law required that the terms be concurrent, violating the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Ex. QQ at 65–71). In his reply to the State's response, Petitioner requested that the court order that any available evidence in the State's custody that was not previously collected, tested for DNA, or submitted to the jury be tested, and that Laughlin and John be subpoenaed to testify at

an evidentiary hearing. (Ex. TT).

On August 16, 2016 the Rule 32 court issued its order dismissing the PCR proceeding. (Ex. UU). The court broadly categorized all of Petitioner's claims as either prosecutorial misconduct or IAC. The court first found that, other than the IAC claims, all of Petitioner's claims, including the prosecutorial misconduct claims such as selective prosecution and spoliation of evidence, were precluded under Rule 32.2(a)(3) because they could have been raised at trial or on direct appeal. *Id.* at 173. As to Petitioner's IAC claims, the court found that Petitioner failed to state a colorable claim for relief under *Strickland* because he had failed to show that counsel's performance was deficient or that the alleged deficiency prejudiced him. *Id.* at 173–74. The court reasoned that there was a strong presumption that counsel's actions fell within the broad range of reasonable conduct, and that Petitioner failed to demonstrate that counsel's actions fell outside of this range or were otherwise deficient. *Id.* at 174. The court also found that Petitioner failed to show prejudice, stating that the "petition nowhere establishes that, had counsel done any or all of the things Defendant says should have been done, that the outcome would have been any different." *Id.* The court further commented that "given Defendant's theory of the case—that he confronted two intoxicated individuals who attempted to carjack his wife's car and yet *somehow he ended up being driven from the scene by one of the carjackers in the carjackers' truck*—showing prejudice is virtually impossible." *Id.* The court therefore dismissed the Rule 32 petition.

On September 1, 2016 Petitioner filed a notice of appeal and a petition for review in the Arizona COA. (Exs. VV, WW, and XX). Petitioner presented two issues for review: (1) did the trial court err in dismissing the PCR petition where Petitioner alleged constitutional deprivations by the State and the court did not require an evidentiary hearing or DNA testing, in violation of the Fifth, Sixth, and Fourteenth Amendments, Arizona Constitution, Ariz. R. Crim. P. 15, and Ariz. R. Evid. 201(c)(2); and (2) were the trial court's decisions, orders, and sentences in violation of the United States Constitution, Arizona Constitution, A.R.S. § 13-116, and Rule 32.8(a), causing the court to lose subject

matter jurisdiction for refusing to secure Petitioner's constitutional rights, in violation of the Fifth, Sixth, and Fourteenth Amendments and Arizona Constitution. (Ex. WW at 4). Petitioner also presented a list of issues not decided by the trial court: (1) pre-accusation delay where Medina was allowed to access his truck before an indictment or formal charges were filed, disturbing evidence before defense access, violating Petitioner's due process rights under the Fifth, Sixth, and Fourteenth Amendments, Arizona Constitution, and Arizona Rules of Evidence; (2) selective prosecution where the State did not collect evidence from Medina's person, allowed him to testify against Petitioner, and allowed him to access his truck, violating the Fifth, Sixth, and Fourteenth Amendments, Arizona Constitution, and Arizona Rules of Evidence; (3) denial of the presumption of innocence when the State's exhibits showed Petitioner in a neck brace and handcuffed to the hospital bed, violating the Fifth, Sixth, and Fourteenth Amendments and Arizona Constitution; (4) prosecutorial misconduct where the State failed to test and collect all available evidence including the sun visor, Laughlin's 911 call, and photographs of Medina's injuries; the prosecutor committed perjury by stating Petitioner was the only one with injuries consistent with the inside of Medina's truck; the prosecutor allowed John and Laughlin to be absent from trial; and the prosecutor vouched for the State's mistakes while saying the defense presented a smoke and mirrors case, repeatedly referred to Petitioner's parole status, and presented an unsubstantiated and unproven personal theory, violating the Fifth, Sixth, and Fourteenth Amendments, Arizona Constitution, and Arizona Rules of Professional Conduct and Ethical Responsibilities; (5) mishandling of evidence where the State allowed an officer to drive the Lincoln back to the scene with Petitioner's blood in it, allowing cross contamination, violating the Fifth, Sixth, and Fourteenth Amendments, Arizona Constitution, Department Procedures, and Arizona Rules of Evidence; (6) ineffective assistance of trial counsel for failing to: address the State's incomplete discovery and pre-indictment delay, protect Petitioner's due process and compulsory process rights, object to late disclosure of the sun visor, object to Laughlin's and John's absences from trial, and submit a limiting instruction on Petitioner's parole status, violating the Fifth, Sixth, and

Fourteenth Amendments and Arizona Constitution; (7) ineffective assistance of appellate counsel for failing to raise all colorable claims: denial of a fair trial, insufficient evidence to support the verdict, violation of compulsory process, prosecutorial misconduct for perjury and vouching, loss of presumption of innocence, and double punishment, violating the Fifth, Sixth, and Fourteenth Amendments and Arizona Constitution; and (8) the trial court failed to apply A.R.S. § 13-116, requiring that Petitioner's sentences be concurrent, violating the Fifth, Sixth, and Fourteenth Amendments and Arizona Constitution. (Ex. WW at 4–7). As to the Rule 32 court's dismissal of his claims as precluded, Petitioner alleged that he had no opportunity to raise the claims earlier because appellate counsel failed to raise them, and Petitioner only discovered the claims when he received all the transcripts. *Id.* at 9. Petitioner further alleged that he was entitled to an evidentiary hearing and that the failure to conduct one deprived him of due process and judicial notice because actual innocence was at stake. *Id.*

After the State filed its response, Petitioner filed a reply demanding an evidentiary hearing and arguing that the trial court's failure to order DNA testing and an evidentiary hearing denied him due process, compulsory process, and equal protection under the Fifth, Sixth, and Fourteenth Amendments. (Ex. BBB at 13–14). Petitioner alleged that the COA was required to take judicial notice of the facts and fundamental error, even if the claims of error were not properly preserved. *Id.* at 14–15. Petitioner further argued that the State had presented insufficient evidence with improper proof and relied on perjured statements from officers and Medina. *Id.* at 16.

On January 4, 2018 the COA issued its decision granting review and denying relief. (Ex. DDD). The court noted that "[a]bsent an abuse of discretion or error of law, this court will not disturb a superior court's ruling on a petition for post-conviction relief." *Id.* at 25. The court then stated that it had "reviewed the record in this matter, the superior court's order denying the petition for post-conviction relief, and the petition for review[,]" and found that Petitioner had "not established an abuse of discretion." *Id.*

On January 29, 2018 Petitioner filed a petition for review in the Arizona Supreme

Court that exceeded the allowed page limit. (Exs. HHH and YYY). The court ordered Petitioner to file a petition that did not exceed the word limit (Ex. III), and on February 12, 2018 Petitioner filed his revised petition for review (Ex. JJJ). Petitioner presented two issues for review: (1) whether the COA abused its discretion in failing to decide that the trial court abused its discretion when it admitted the sun visor evidence; and (2) the Supreme Court should order testing of the sun visor and any other available evidence that had not been previously tested. *Id.* at 71. Petitioner then presented a list of issues incorrectly decided by the lower courts: (1) the trial court erred in dismissing PCR; (2) the trial court's decisions, orders, and sentence were in violation of the United States Constitution, Arizona Constitution, and Arizona Rules and Statutes; (3) pre-indictment delay; (4) selective prosecution; (5) denial of presumption of innocence; (6) prosecutorial misconduct; (7) mishandling of evidence; (8) ineffective assistance of trial counsel; (9) appellate counsel failed to raise cognizable issues; and (10) the trial court imposed consecutive sentences that should have been concurrent under A.R.S. § 13-116. *Id.* at 71–75.

On July 30, 2018 the Arizona Supreme Court denied the petition for review (Ex. OOO), and on August 30, 2018 the COA issued its mandate (Ex. GGG).

## C. Habeas Petition

On February 19, 2019 Petitioner filed his Amended PWHC in this Court. (Doc. 7). Petitioner alleges six grounds for relief and multiple sub-claims:

In Ground One Petitioner alleges that he is actually innocent in violation of the Fifth, Sixth, and Fourteenth Amendments. (Doc. 7 at 6). Petitioner bases this claim on Kendrick John's police interview shortly after the fatal accident and alleges that John saw Medina drive away in the truck that caused the accident. Petitioner further alleges that John should have been secured as an eyewitness for trial.

In Ground Two Petitioner alleges ineffective assistance of trial counsel in violation of the Fifth, Sixth, and Fourteenth Amendments and Petitioner's due process and compulsory process rights because: (a) counsel failed to secure Cheryl Laughlin as a witness or object to her absence at trial and failed to request that she appear telephonically;

(b) counsel failed to subpoena and secure Jeffrey Steiner as a witness; (c) counsel failed to object to Kendrick John's absence and allowed the trial to proceed without him as a witness and did not move the State to bring John to justice on his active warrants; (d) counsel failed to submit a limiting instruction on Petitioner's parole status, causing fundamental error and denying Petitioner the right to a fair trial; (e) counsel failed to file a motion in limine to preclude the State from introducing a sun visor on day five of trial when counsel knew about the sun visor before trial; (f) the State's investigation was incomplete and counsel failed to conduct his own investigation of the bloodwork and DNA testing of Medina, including blood on the steering wheel and DNA on the sun visor; and (g) counsel failed to provide Petitioner with necessary disclosure including police reports, interviews, and transcribed recordings, and only gave Petitioner one manilla envelope less than an inch thick. (Doc. 7 at 7–13).

In Ground Three Petitioner alleges prosecutorial misconduct in violation of the Fifth, Sixth, and Fourteenth Amendments because: (a) the prosecutor used a "back door" to unfairly inform the jury of Petitioner's parole status;[17] (b) the prosecutor committed perjury to the tribunal by failing to submit Medina's medical records and stating Petitioner was the only one with injuries consistent with the inside of the truck while knowing Medina had severe, accident-type injuries;[18] and (c) the prosecutor improperly vouched for the State's incomplete investigation and admitted mistakes were made.[19] (Doc. 7 at 14–16).

In Ground Four Petitioner alleges that he was denied the right to confront witnesses against him in violation of the Fifth, Sixth, and Fourteenth Amendments because John, Laughlin, and Steiner were not present at trial. (Doc. 7 at 17).[20]

In Ground Five Petitioner alleges that his due process rights under the Fifth, Sixth, and Fourteenth Amendments were violated because: (a) the trial court denied his Rule 32

---

[17] Petitioner also alleges this violates the Arizona Constitution.
[18] Petitioner also alleges this violates the rules of professional conduct and ethical responsibilities.
[19] Petitioner also alleges this violates the rules of professional conduct and ethical responsibilities.
[20] Petitioner also states that this violates due process and compulsory process.

petition and did not hold an evidentiary hearing under 38.8(a) entitlement,[21] denying due process and judicial notice; (b) he was denied the presumption of innocence when trial exhibits showed Petitioner in a neck brace and handcuffed to the hospital bed when he had no neck injuries and was not under arrest; (c) he was selectively prosecuted because Medina was a potential suspect and had severe injuries but the police collected no evidence from him, Medina was allowed to testify against Petitioner, and the police allowed Medina to access his truck before defense counsel had an opportunity to examine it; (d) there was a 110-day pre-accusation delay between the incident and the indictment that allowed the State to not completely investigate all available evidence; specifically, blood on the steering wheel and evidence from Medina was not collected; (e) the State failed to disclose the entirety of Cheryl Laughlin's 911 call; (f) he was subject to double punishment when the court imposed consecutive sentences and should have imposed concurrent terms pursuant to Ariz. Rev. Stat. § 13-116; and (g) the police failed to follow procedures and protocols to impound and preserve evidence and caused cross-contamination of evidence and tracking of blood when Deputy Gonzales drove the Lincoln with Petitioner's blood in it to the scene of the accident, and photos were taken of the inside and outside of the truck and the Lincoln. (Doc. 7 at 18–24).

In Ground Six Petitioner alleges ineffective assistance of appellate counsel in violation of the Fifth, Sixth, and Fourteenth Amendments and the Arizona Constitution based on counsel's failure to raise and preserve the cognizable issues of prosecutorial misconduct,[22] insufficiency of the evidence, and double punishment/consecutive sentences, depriving fundamental preservation and exhaustion of the issues. (Doc. 7 at 25).

Petitioner requests immediate release from custody. (Doc. 7 at 27).

## II.   STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits the

---

[21] The Court presumes that Petitioner intended to cite to former Ariz. R. Crim. P. 32.8(a) (effective through December 31, 2019) concerning evidentiary hearings in PCR proceedings, as there is no Rule 38.8(a) and Rule 38 applies to deferred prosecution programs.
[22] Petitioner does not specify what claims of prosecutorial misconduct appellate counsel should have raised.

federal court's power to grant a petition for a writ of habeas corpus on behalf of a state prisoner. First, the federal court may only consider petitions alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Sections 2254(b) and (c) provide that the federal courts may not grant habeas corpus relief, with some exceptions, unless the petitioner exhausted state remedies. Additionally, if the petition includes a claim that was adjudicated on the merits in state court proceedings, federal court review is limited by § 2254(d).

## A. Exhaustion

A state prisoner must exhaust his state remedies before petitioning for a writ of habeas corpus in federal court. 28 U.S.C. § 2254(b)(1) & (c); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). To exhaust state remedies, a petitioner must afford the state courts the opportunity to rule upon the merits of his federal claims by fairly presenting them to the state's highest court in a procedurally appropriate manner. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) ("To provide the State with the necessary opportunity, the prisoner must fairly present her claim in each appropriate state court . . . thereby alerting the court to the federal nature of the claim."). In Arizona, unless a prisoner has been sentenced to death, the highest court requirement is satisfied if the petitioner has presented his federal claim to the Arizona COA, either through the direct appeal process or post-conviction proceedings. *Crowell v. Knowles*, 483 F. Supp. 2d 925, 931–33 (D. Ariz. 2007).

A claim is fairly presented if the petitioner describes both the operative facts and the federal legal theory upon which the claim is based. *Kelly v. Small*, 315 F.3d 1063, 1066 (9th Cir. 2003), *overruled on other grounds by Robbins v. Carey*, 481 F.3d 1143 (9th Cir. 2007). The petitioner must have "characterized the claims he raised in state proceedings *specifically* as federal claims." *Lyons v. Crawford*, 232 F.3d 666, 670 (9th Cir. 2000), *opinion amended and superseded*, 247 F.3d 904 (9th Cir. 2001). "If a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted regardless of its similarity to the issues raised in state court." *Johnson v. Zenon*, 88 F.3d 828, 830 (9th Cir. 1996). "Moreover, general appeals to broad

constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish exhaustion." *Hivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999).

However, "[a] habeas petitioner who [fails to properly exhaust] his federal claims in state court meets the technical requirements for exhaustion" if there are no state remedies still available to the petitioner. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). "This is often referred to as 'technical' exhaustion because although the claim was not actually exhausted in state court, the petitioner no longer has an available state remedy." *Thomas v. Schriro*, 2009 WL 775417, at *4 (D. Ariz. March 23, 2009). "If no state remedies are currently available, a claim is technically exhausted," but, as discussed below, the claim is procedurally defaulted and is only subject to federal habeas review in a narrow set of circumstances. *Garcia v. Ryan*, 2013 WL 4714370, at *8 (D. Ariz. Aug. 29, 2013).

**B. Procedural Default**

If a petitioner fails to fairly present his claim to the state courts in a procedurally appropriate manner, the claim is procedurally defaulted and generally barred from federal habeas review. *Ylst v. Nunnemaker*, 501 U.S. 797, 802–05 (1991). There are two categories of procedural default. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729–30. Second, the claim may be procedurally defaulted if the petitioner failed to present the claim in a necessary state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1; *O'Sullivan*, 526 U.S. at 848 (when time for filing state court petition has expired, petitioner's failure to timely present claims to state court results in a procedural default of those claims); *Smith v. Baldwin*, 510 F.3d 1127, 1138 (9th Cir. 2007) (failure to exhaust claims in state court resulted in procedural default of claims for federal habeas purposes when state's rules for filing petition for post-conviction relief barred petitioner from returning to state court to exhaust his claims).

When a petitioner has procedurally defaulted his claims, federal habeas review occurs only in limited circumstances. "A state prisoner may overcome the prohibition on reviewing procedurally defaulted claims if he can show cause to excuse his failure to comply with the state procedural rule and actual prejudice resulting from the alleged constitutional violation." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) (internal quotations and citation omitted); *Martinez v. Ryan*, 566 U.S. 1, 10 (2012) ("A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law."). Cause requires a showing "that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Impediments to compliance may include interference by officials that makes compliance with the state's procedural rule impracticable, a showing that the factual or legal basis for the claim was not reasonably available, or the procedural default was the result of ineffective assistance of counsel. *Id.* at 488–89. Prejudice requires "showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). The Court need not examine the existence of prejudice if the petitioner fails to establish cause. *Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982); *Thomas v. Lewis*, 945 F.2d 1119, 1123 n.10 (9th Cir. 1991).

Additionally, a habeas petitioner "may also qualify for relief from his procedural default if he can show that the procedural default would result in a 'fundamental miscarriage of justice.'" *Cook v. Schriro*, 538 F.3d 1000, 1028 (9th Cir. 2008) (quoting *Schlup v. Delo*, 513 U.S. 298, 321 (1995)). This exception to the procedural default rule is limited to habeas petitioners who can establish that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup*, 513 U.S. at 327; *see also Murray*, 477 U.S. at 496; *Cook*, 538 F.3d at 1028.

## C. Adjudication on the Merits and § 2254(d)

The Ninth Circuit has held that "a state has 'adjudicated' a petitioner's constitutional

claim 'on the merits' for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review of the merits." *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).

If a habeas petition includes a claim that was properly exhausted, has not been procedurally defaulted, and was adjudicated on the merits in state court proceedings, federal court review is limited by § 2254(d). Under § 2254(d)(1), a federal court cannot grant habeas relief unless the petitioner shows: (1) that the state court's decision was contrary to federal law as clearly established in the holdings of the United States Supreme Court at the time of the state court decision, *Greene v. Fisher*, 565 U.S. 34, 38 (2011); (2) that it "involved an unreasonable application of" such law, § 2254(d)(1); or (3) that it "was based on an unreasonable determination of the facts" in light of the record before the state court, 28 U.S.C. § 2254(d)(2); *Harrington v. Richter*, 562 U.S. 86 (2011). This standard is "difficult to meet." *Richter*, 562 U.S. at 102. It is also a "highly deferential standard for evaluating state court rulings . . . which demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (internal quotations and citation omitted).

## III.   ANALYSIS

The undersigned finds that Petitioner's claims in Ground One, Ground Five (a), (f), and (g), and the portions of Ground Three (a), (b), and (c) and Ground Six that allege violations of the Arizona Constitution and Arizona Rules of Professional Conduct, are not cognizable on habeas review. The undersigned further finds that Petitioner's claims in Ground Two (b), (e), (f), and (g), and part of Ground Two (a), are unexhausted and procedurally defaulted because the court to which Petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. The undersigned finds that Petitioner's claims in Ground Three (a), Ground Four, and Ground Five (e) are unexhausted and expressly procedurally defaulted because the state court applied a plain procedural bar. Additionally, the undersigned finds

that Petitioner's claims in Ground Three (b) and (c), and Ground Five (b), (c), and (d), were properly exhausted but nonetheless procedurally defaulted because the state court applied a plain procedural bar. The undersigned further finds that Petitioner does not show cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default of his claims. Finally, the undersigned addresses Petitioner's claims that are properly exhausted, not procedurally defaulted, and were adjudicated on the merits in state court proceedings, and concludes that Petitioner is not entitled to relief on Ground Two (c) and (d), part of Ground Two (a), and Ground Six. Accordingly, for the reasons explained below, the undersigned recommends that the District Court deny the PWHC.

## A. Non-Cognizable Claims

Habeas is not the remedy for every legal error—federal habeas relief is only available to state prisoners to correct violations of the United States Constitution, federal laws, or treaties of the United States. 28 U.S.C. § 2254(a). Habeas petitioners must plead their claims with particularity and must specify all grounds for relief and the facts supporting those grounds. Rule 2(c), Rules Governing § 2254 cases; *Mayle v. Felix*, 545 U.S. 644, 656 (2005). Further, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("federal habeas corpus relief does not lie for errors of state law"). This Court presumes that the state court properly applied the law, *see, e.g.*, *Holland v. Jackson*, 542 U.S. 649, 655 (2004); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (state court decisions must "be given the benefit of the doubt"), and gives deference to the trier of fact, *Wright v. West*, 505 U.S. 277, 296 (1992); *Sumner v. Mata*, 455 U.S. 591 (1982). A petitioner also cannot transform his state law claims into federal ones merely by asserting a violation of due process. *Rivera v. Illinois*, 556 U.S. 148, 158 (2009) ("'A mere error of state law . . . is not a denial of due process.'" (quoting *Engle*, 456 U.S. at 121 n.21)); *see also Poland v. Stewart*, 169 F.3d 573, 584 (9th Cir. 1999); *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996). Relatedly, a petitioner cannot recast his state law claim as a federal constitutional challenge to the sufficiency of the evidence. *Curtis v. Montgomery*, 552 F.3d

578, 582 (7th Cir. 2009). However, violations of state law are cognizable on habeas if the state court's application of state law was so arbitrary or capricious as to constitute an independent due process violation that rendered the trial fundamentally unfair. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Lyons v. Brady*, 666 F.3d 51, 55–56 (1st Cir. 2012).

Here, the undersigned finds that some of Petitioner's claims appear to be based on the state court's determination of a state law issue, and habeas relief does not lie for errors of state law. The undersigned further finds that Petitioner's claim of actual innocence is not cognizable as an independent ground for habeas relief.

  i. Ground One: Actual Innocence

Petitioner alleges that he is actually innocent based on Kendrick John's interview with Detective LaBenz that took place shortly after the fatal accident. (Doc. 7 at 6). Petitioner alleges that Detective LaBenz stated "we know who was driving the truck and it was not your friend," that a complete investigation was not conducted, and that LaBenz "made up his mind he knew who was driving the truck." *Id.* Petitioner points to statements in John's interview such as "he took the truck and left" as alleged evidence that Medina was driving the truck at the time of the fatal collision. (Doc. 7-1 [Petitioner's Ex. I] at 61:14–17).[23] Respondents argue that this claim is not cognizable because the Ninth Circuit has never recognized a free-standing claim of actual innocence on habeas.

"Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Id.* (citing *Moore v. Dempsey*, 261 U.S. 86, 87–88 (1923) (Holmes, J.) ("[W]hat we have to deal with [on habeas review] is not the petitioners' innocence or guilt

---

[23] As discussed later in this opinion, John did not testify at trial. The statements Petitioner relies on are from a transcript of John's interview with LaBenz that Petitioner attached to his PWHC.

but solely the question whether their constitutional rights have been preserved.")).

Here, Petitioner is not entitled to federal habeas relief based solely on his claim of actual innocence of the criminal acts underlying his conviction. *See Coley v. Gonzalez*, 55 F.3d 1385, 1387 (9th Cir. 1995). Even if Petitioner's claim of innocence was a cognizable claim in this habeas proceeding, Petitioner has not offered any evidence that affirmatively proves his innocence. *See Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) ("[A] habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent."); *Jones v. Taylor*, 763 F.3d 1242, 1251 (9th Cir. 2014) ("Evidence that merely undercuts trial testimony or casts doubt on the petitioner's guilt, but does not affirmatively prove innocence, is insufficient to merit relief on a freestanding claim of actual innocence."). Rather, the evidence Petitioner relies on consists of vague statements by an intoxicated and sometimes unintelligible John that Medina left in the truck, that John woke up and Medina was gone and the truck was gone, and that John didn't want his friend to get in trouble for drinking and driving. *See* Doc. 7-1 Ex. I. John's statements do not establish when Medina allegedly left in the truck, let alone affirmatively prove that Medina was the driver of the truck at the time of the fatal collision. Based on the Court's review of the record in this matter, the exact sequence of events leading up to the fatal collision is unclear and will likely remain so due to Petitioner's and witnesses' intoxication at the time of the accident, their changing stories of what transpired, and their alleged confusion and memory loss. At most, the statements Petitioner relies on in John's interview cast some doubt on the State's theory as to who was driving the truck at the time of the fatal collision, but this evidence falls far from the threshold required to merit relief on a freestanding claim of actual innocence. *See, e.g.*, *Carriger*, 132 F.3d at 477 (court rejected freestanding actual innocence claim where petitioner had "presented no evidence, for example, demonstrating he was elsewhere at the time of the murder, nor [was] there any new and reliable physical evidence, such as DNA, that would preclude the possibility of guilt"); *Jones*, 763 F.3d at 1251 (petitioner failed to meet "extraordinarily high" and "truly persuasive" showing

1   required for habeas relief on a freestanding claim of actual innocence where there was no

2   new and reliable physical evidence, victim recantation was not sufficiently reliable such

3   that every juror would credit it, and there was other testimonial evidence supporting the

4   verdict); *see generally Jones v. Wood*, 207 F.3d 557, 563 (9th Cir. 2000) (even where

5   evidence is "almost entirely circumstantial and relatively weak," it may be sufficient to

6   support a conviction); *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995)

7   ("Circumstantial evidence and inferences drawn from it may be sufficient to sustain a

8   conviction."); *United States v. Johnson*, 804 F.2d 1078, 1083 (9th Cir. 1986) (the

9   government is entitled to all reasonable inferences that may be drawn from the evidence).[24]

10   Accordingly, the undersigned finds that Petitioner's Ground One claim should be

11   denied.[25]

12        ii.    Ground Five (a)

13   Petitioner alleges that the Rule 32 court's denial of his PCR petition and failure to

14   hold an evidentiary hearing under Rule 32.8(a) denied him due process and judicial notice.

15   This argument is premised on the state court's denial of an evidentiary hearing under Ariz.

16   R. Crim. P. 32 and thus concerns a state law issue not cognizable on federal habeas review.

17   *See Estelle*, 502 U.S. at 67–68. Habeas is not the remedy for every legal error, nor is it a

18   forum for petitioners to argue alleged errors in the state PCR process. *See Franzen v.*

19   *Brinkman*, 877 F.2d 26 (9th Cir. 1989) ("a petition alleging errors in the state post-

20   conviction review process is not addressable through habeas corpus proceedings"). This

21   claim fails to allege a specific, federal constitutional violation, and Petitioner cannot

22   transform his state law claim into a federal claim merely by alleging a violation of due

23
24   [24] Nor is the evidence Petitioner relies on "new." Detective LaBenz's interview with John was available prior to trial, and Petitioner's counsel questioned LaBenz about the interview on cross-examination. *See* Ex. P. at 745–55. During a sidebar with the trial judge, Petitioner's counsel confirmed that John's statement during the interview was not "I saw

25   Medina drive away"; rather, the statements John made were that Medina was gone and the truck was gone. *Id.* at 755.

26   [25] The undersigned further rejects Petitioner's gross speculation that Detective LaBenz had some hidden motive to implicate someone other than Medina as the driver of the truck at the time of the fatal accident and lied to the grand jury. (Doc. 17 at 20). At trial, LaBenz

27   testified that when he spoke to John after the incident, LaBenz alluded that the police had people in mind as suspects. (Ex. P at 745:23–746:9). LaBenz made this statement based on

28   the information that he had at the time from other officers and the hospitals. *Id.*

process. *Rivera*, 556 U.S. at 158; *Mayle*, 545 U.S. at 646; *see also Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) (a petitioner's conclusory suggestion that a constitutional right has been violated falls "far short of stating a valid claim of constitutional violation" sufficient to provide a basis for habeas relief). Accordingly, the undersigned finds that Ground Five (a) is not cognizable on habeas review.

### iii.   Ground Five (f)

Petitioner alleges that he was wrongly subjected to double punishment when the trial court imposed consecutive sentences because his sentences should have been concurrent under Ariz. Rev. Stat. § 13-116.[26] This argument is premised on whether the trial court's sentences complied with state statutes and thus concerns a state law issue not cognizable on federal habeas review. *See Estelle*, 502 U.S. at 67–68; *Rivera*, 556 U.S. at 158; *Mayle*, 545 U.S. at 646; *Jones*, 66 F.3d at 205. Further, Petitioner was charged and convicted of two separate acts: second-degree murder, in violation of Ariz. Rev. Stat. § 13-1104, and leaving the scene of a fatal injury accident, in violation of Ariz. Rev. Stat. § 28-661. Section 28-661 specifically provides that "[t]he sentence imposed on a person for a conviction under this section shall run consecutively to any sentence imposed on the person for other convictions on any other charge related to the accident." Thus, Petitioner's sentence appears to comply with state law. Accordingly, the undersigned finds that Ground Five (f) is not cognizable on habeas review.

### iv.   Ground Five (g)

Petitioner alleges that the police failed to follow procedures and protocols to impound and preserve evidence and caused cross-contamination of evidence. Officers' failure to follow department procedures and protocols does not allege a federal, constitutional violation, and Petitioner cannot transform this claim into a federal habeas claim merely by alleging a violation of due process. *See Rivera*, 556 U.S. at 158; *Mayle*, 545 U.S. at 646; *Jones*, 66 F.3d at 205. Accordingly, the undersigned finds that Ground

---

[26] Ariz. Rev. Stat. § 13-116 states that "an act or omission which is made punishable in different ways by different sections of the laws may be punished under both, but in no event may sentences be other than concurrent."

Five (g) is not cognizable on habeas review.

              v.    Claims Pursuant to the Arizona Constitution and Arizona Rules of Professional Conduct

In addition to the alleged federal constitutional violations, Petitioner alleges that several of his claims also violate the Arizona Constitution and the Arizona Rules of Professional Conduct.[27] Habeas relief is only available for violations of the United States Constitution. 28 U.S.C. § 2254(a). Thus, to the extent that Petitioner alleges separate claims based on the Arizona Constitution or Arizona Rules of Professional Conduct, the undersigned finds that the claims are not cognizable on habeas review.[28]

**B. Unexhausted and Procedurally Defaulted Claims**

          i.    Ground Two (a)

Petitioner alleges that trial counsel was ineffective for failing to secure Cheryl Laughlin as a witness or object to her absence and failing to request that she appear telephonically. Claims for IAC are properly raised in a Rule 32 petition for PCR. While Petitioner did present part of this claim to the state courts, he did not exhaust the specific claim that he now makes that counsel was ineffective for failing to request that Laughlin appear telephonically. In his second PCR petition, Petitioner alleged that trial counsel was ineffective for failing to object to Laughlin's absence or offer a telephonic appearance as a reasonable alternative. (Ex. QQ at 69). However, in his petition for review to the COA, Petitioner only alleged that counsel was ineffective for failing to object to Laughlin's absence from trial and did not specifically argue that counsel was ineffective for failing to request that Laughlin appear telephonically. (Ex. WW at 7).

"As a general matter, each 'unrelated alleged instance [] of counsel's

---

[27] *See* Ground Three (a), (b), and (c), and Ground Six.

[28] Where a petitioner fails to allege a deprivation of a federal right, it is unnecessary to determine whether he has satisfied the exhaustion requirement; the claim is simply dismissed as not cognizable. *Engle*, 456 U.S. at 121 n.19. ("If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable. It is unnecessary in such a situation to inquire whether the prisoner preserved his claim before the state courts."). Thus, as discussed in the foregoing section, because the undersigned finds that some of the grounds alleged in the PWHC fail to state a cognizable claim for habeas relief, the undersigned does not address exhaustion of these claims.

ineffectiveness' is a separate claim for purposes of exhaustion." *Gulbrandson v. Ryan*, 738 F.3d 976, 992 (9th Cir. 2013) (quoting *Moormann v. Schriro*, 426 F.3d 1044, 1056 (9th Cir. 2005)). And, exhaustion requires that a petitioner fairly present each claim to the state court in a procedurally appropriate manner. *Baldwin*, 541 U.S. at 29. "[A] petitioner satisfies the exhaustion requirement if he properly pursues a claim (1) throughout the *entire direct appellate process* of the state, or (2) throughout one entire judicial post-conviction process available in the state." *Casey v. Moore*, 386 F.3d 896, 916 (9th Cir. 2004) (quoting Liebman & Hertz, Federal Habeas Corpus Practice and Procedure, § 23.3b (4th ed. 1998)).

Accordingly, the claim that trial counsel was ineffective for failing to request that Laughlin appear telephonically is unexhausted because Petitioner failed to properly present this specific portion of his federal claim to the COA. *See* Ariz. R. Crim. P. 32.16(c)(4) ("A party's failure to raise any issue that could be raised in the petition for review . . . constitutes a waiver of appellate review of that issue."); *Castillo v. McFadden*, 399 F.3d 993, 998 (9th Cir. 2004) (To properly exhaust a claim, a petitioner must "give the Arizona courts a 'fair opportunity' to act on his federal [] claim before presenting it to the federal courts."); *Date v. Schriro*, 619 F. Supp. 2d 736, 786 (D. Ariz. 2008) (IAC claims unexhausted where petitioner raised claims in Rule 32 petition but failed to raise claims in petition for review to Arizona COA); *Crowell*, 483 F. Supp. at 931–33.[29]

####    ii.    Ground Two (b)

Petitioner alleges that trial counsel was ineffective for failing to subpoena and secure Jeffrey Steiner as a witness. While Petitioner made claims to the state courts regarding counsel's alleged failure to secure John and Laughlin as witnesses, Petitioner did not specifically raise a claim that trial counsel was ineffective for failing to subpoena Steiner.[30] Asserting an IAC claim "based on one set of facts [presented to the state courts],

---

[29] Moreover, even assuming that Petitioner did properly exhaust this claim to the COA, as discussed further in Section D below, the PCR court rejected Petitioner's IAC claims for failure to state a colorable claim for relief (Ex. UU at 173–74), a finding upheld by the COA when it denied the petition for review (Ex. DDD).

[30] In the second PCR petition, Petitioner did not list a claim that trial counsel was ineffective for failing to subpoena Steiner. *See* Ex. QQ at 69–70. In the argument section of the petition, Petitioner alleged that trial counsel failed to have "Laughlin's accompanied companion that night subpoenaed and present for trial . . . ." *Id.* at 90. In his petition for

does not exhaust other claims of ineffective assistance of counsel based on different facts" that were not presented to the state courts. *Date,* 619 F. Supp. 2d at 788; *see also Moormann*, 426 F.3d at 1056–57 (new allegations of IAC not previously raised before the state court cannot be addressed on habeas review); *Gulbrandson*, 738 F.3d at 992–993 (IAC claim before the state court regarding counsel's failure to present witness testimony about petitioner's state of mind was insufficient to exhaust IAC claim before the federal court that counsel was ineffective for failing to present testimony from same witness on petitioner's rehabilitation). Accordingly, Ground Two (b) is unexhausted because Petitioner failed to properly present it to the state courts in a procedurally appropriate manner.

       iii.    Ground Two (e)

Petitioner alleges that trial counsel was ineffective for failing to file a motion in limine to preclude the State from introducing the sun visor at trial when counsel knew about the sun visor before trial. In his second PCR petition, Petitioner argued generally that trial counsel was ineffective for failing to request sanctions for the State's failure to complete discovery and disclose evidence but did not make any specific arguments regarding trial counsel's alleged ineffectiveness and the sun visor. (Ex. QQ at 69; 89–92). In his petition for review to the COA, Petitioner argued that trial counsel was ineffective for failing to object to the State's alleged late disclosure of the sun visor. (Ex. WW at 7). Thus, Petitioner's claim to the COA is distinct from the claim that Petitioner now makes on habeas—that counsel was ineffective for failing to file a motion in limine to have the evidence precluded. *See Date,* 619 F. Supp. 2d at 788; *Moormann*, 426 F.3d at 1056–57; *Gulbrandson*, 738 F.3d at 992–993; *Tamalini v. Stewart,* 249 F.3d 895, 898 (9th Cir. 2001) (a petitioner fairly presents his claim in state court only if the state court claim described both the same set of operative facts and the applicable law). Moreover, Petitioner failed to raise the claim in his Rule 32 petition, depriving the trial court of the opportunity to address and correct the alleged violation of Petitioner's constitutional rights. *See Baldwin*, 541 U.S.

---

review to the COA, Petitioner only raised trial counsel's ineffectiveness for failing to investigate and object to Laughlin's and John's absences from trial. (Ex. WW at 7).

at 29; *Castillo*, 399 F.3d at 998; *Crowell*, 483 F. Supp. at 931–33. Accordingly, Ground Two (e) is unexhausted because Petitioner failed to properly present it to the state courts in a procedurally appropriate manner.

> iv.     Ground Two (f)

Petitioner alleges that trial counsel was ineffective for failing to conduct his own investigation of Medina's bloodwork and DNA, including the blood on the steering wheel and the DNA on the sun visor. In his second PCR petition, Petitioner argued that trial counsel was ineffective because he did not independently collect, test, and examine the available evidence; specifically, counsel did not test or collect the uncollected blood transfers, and did not request that Medina's blood be drawn for DNA testing. (Ex. QQ at 69, 90). However, Petitioner did not argue that counsel was ineffective for failing to test DNA on the sun visor. *See Date,* 619 F. Supp. 2d at 788; *Moormann*, 426 F.3d at 1056–57; *Gulbrandson*, 738 F.3d at 992–993. Further, in his petition for review to the COA, Petitioner did not allege that trial counsel was ineffective for failing to investigate Medina's blood and DNA or failing to investigate DNA on the sun visor. Rather, Petitioner only presented claims to the COA that trial counsel was ineffective for failing to address issues of the State's incomplete discovery and pre-indictment delay, failing to protect Petitioner's due process and compulsory process rights, failing to object to late disclosure of the sun visor, failing to object to Laughlin's and John's absences from trial, and failing to submit a limiting instruction on Petitioner's parole status. (Ex. WW at 7). The COA is not required to address a claim that the petitioner fails to raise. *See* Ariz. R. Crim. P. 32.16(c)(4). Accordingly, because Petitioner failed to raise the sun visor portion of this claim to the Rule 32 court, and failed to raise the claim entirely to the COA, Ground Two (f) is unexhausted because Petitioner failed to properly present it to the state courts in a procedurally appropriate manner.[31] *See Baldwin*, 541 U.S. at 29; *Castillo*, 399 F.3d at 998; *Crowell*, 483 F. Supp. at 931–33; *Tamalini*, 249 F.3d at 898.

---

[31] Moreover, even assuming that Petitioner did properly exhaust this claim, as discussed further in Section D below, the PCR court rejected all of Petitioner's IAC claims for failure to state a colorable claim for relief (Ex. UU at 173–74), a finding upheld by the COA when it denied the petition for review (Ex. DDD).

v.    Ground Two (g)

Petitioner alleges that trial counsel was ineffective for failing to provide Petitioner with disclosure to review before trial, including police reports, interviews, and transcribed recordings, and only gave Petitioner one manilla envelope of material to review. In his second PCR petition, Petitioner made a general claim that trial counsel was ineffective because he failed to protect Petitioner's rights to fair access and presentation of the evidence, exhibits, and witnesses to be submitted to the tribunal. (Ex. QQ at 69). In the argument section of his petition, Petitioner also alleged that trial counsel failed to provide Petitioner with the State's disclosure, violating due process because Petitioner did not receive all vital documents and records used against him. *Id.* at 92. However, Petitioner did not raise this claim in his petition for review to the COA.[32] The COA is not required to address a claim that the petitioner fails to raise. *See* Ariz. R. Crim. P. 32.16(c)(4). Accordingly, Ground Two (g) is unexhausted because Petitioner failed to properly present it to the state courts in a procedurally appropriate manner.[33] *See Baldwin*, 541 U.S. at 29; *Castillo*, 399 F.3d at 998; *Crowell*, 483 F. Supp. at 931–33.

vi.    Ground Three (a)

Petitioner alleges that prosecutorial misconduct occurred when the prosecutor used a "back door" to unfairly inform the jury of Petitioner's parole status by asking Petitioner's wife, Shirley Chavez, whether she deliberately tried to get him away from the accident

---

[32] Petitioner only presented claims to the COA that trial counsel was ineffective for failing to address issues of the State's incomplete discovery and pre-indictment delay, failing to protect Petitioner's due process and compulsory process rights, failing to object to late disclosure of the sun visor, failing to object to Laughlin's and John's absences from trial, and failing to submit a limiting instruction on Petitioner's parole status. (Ex. WW at 7).

[33] Even assuming that Petitioner did properly exhaust this claim, as discussed further in Section D below, the PCR court rejected all of Petitioner's IAC claims for failure to state a colorable claim for relief (Ex. UU at 173–74), a finding upheld by the COA when it denied the petition for review (Ex. DDD).

scene because he was on parole at the time.[34, 35] (Doc. 7 at 14). On direct appeal, Petitioner argued that the trial court's admission of evidence of his parole status without any limiting instruction was reversible, fundamental error. (Ex. BB at 1376). Petitioner did not raise this issue as a prosecutorial misconduct claim. In his first PCR petition, Petitioner alleged a general claim of prosecutorial misconduct because the State allegedly lied to the jury, misrepresented evidence, and failed to complete discovery or produce evidence. (Ex. OO at 57). In his second PCR petition Petitioner argued that the prosecutor committed misconduct by repeatedly referring to Petitioner's parole status as the State's theory of why Petitioner left the scene of the accident. (Ex. QQ at 67, 86–87). In his petition for review to the COA, Petitioner similarly alleged that the prosecutor committed misconduct by repeatedly referring to Petitioner's parole status. (Ex. WW at 6). Thus, the claims Petitioner made on PCR regarding the prosecutor's references to his parole status are distinct from the claim that he now raises on habeas—that the prosecutor unfairly used a back door to introduce testimony of Petitioner's parole status. Accordingly, Ground Three (a) is unexhausted because Petitioner failed to properly present it to the state courts in a procedurally appropriate manner. *See Baldwin*, 541 U.S. at 29; *Castillo*, 399 F.3d at 998; *Crowell*, 483 F. Supp. at 931–33.[36]

---

[34] The record reflects that this testimony was actually elicited by Petitioner's counsel on direct examination of Ms. Chavez. Counsel asked Ms. Chavez whether she was "deliberately trying to get Craig away from the accident scene because he was on parole at the time?" Ms. Chavez responded, "Didn't even cross my mind." (Ex. R at 923:24–924:2). On cross-examination, the following exchange occurred:
> BY MR. SERDEN:
> Q. Now, your testimony was that you took him to the hospital because you were afraid he was going to bleed to death, correct?
> A. Yes.
> Q. Okay. And you've already told the jury that he was on parole, correct?
> A. No, I didn't tell anybody he was on parole.
> Q. Well, Mr. Conter asked you the question that he was on parole and you answered yes, he was?
> A. Well, then I did.

(Ex. R at 942:1–11).
[35] In his Reply, Petitioner states that he and his wife remember the prosecutor, not defense counsel, eliciting the testimony about Petitioner's parole status, and asserts that the trial transcripts are wrong. (Doc. 17 at 52).
[36] Even assuming that Petitioner did properly exhaust this claim, the claim is nevertheless procedurally defaulted because the Rule 32 court applied an express procedural bar when

1

vii.     Ground Three (b)

2          Petitioner alleges that the prosecutor committed perjury to the tribunal by failing to

3    submit Medina's medical records and by stating that Petitioner was the only one with

4    injuries consistent with the inside of the truck. Petitioner did not raise this claim on direct

5    appeal but did raise a similar claim in his PCR proceedings. In the amended PCR notice,

6    Petitioner asserted generally that the prosecutor had presented perjured testimony. (Ex. JJ

7    at 42). In the first PCR petition, Petitioner made similar general allegations that the State

8    had  suppressed  evidence,  used  perjured  testimony,  and  committed  prosecutorial

9    misconduct by lying to the jury, misrepresenting evidence, and failing to produce evidence.

10   (Ex. OO at 57). In his second PCR petition, Petitioner alleged that the State selectively

11   prosecuted him by withholding evidence of Medina's photographed injuries and that the

12   prosecutor committed misconduct by withholding the photos, allowing perjured testimony,

13   and telling the jury that Petitioner was the only one with injuries consistent with the inside

14   of Medina's truck. (Ex. QQ at 66, 85). Finally, in his petition for review to the COA,

15   Petitioner argued that the prosecutor committed misconduct and perjury when he told the

16   jury that Petitioner was the only one with injuries consistent with the inside of the truck

17   and failed to submit photographs of Medina's injuries to the jury. (Ex. WW at 6).

18          Thus, to the extent that Petitioner did fairly and properly present this claim to the

19   state courts, the claim is exhausted. However, the claim is nonetheless procedurally

20   defaulted because the Rule 32 court applied an express procedural bar when it found that

21   all of Petitioner's prosecutorial misconduct claims were precluded as waived by Rule

22   32.2(a)(3) because they could have been raised earlier. (Ex. UU).

23   . . .

24

25   it found that all of Petitioner's prosecutorial misconduct claims were precluded as waived
     by Rule 32.2(a)(3) because they could have been raised earlier (Ex. UU), a finding upheld

26   by the COA when it denied the petition for review (Ex. DDD). *See* Ariz. R. Crim. P.
     32.2(a)(3) (a defendant is precluded from relief under Rule 32.1 based on any ground

27   waived at trial or on appeal); *see also Nunnemaker*, 501 U.S. at 803 (a higher court's
     subsequent summary denial of review affirms the lower court's application of a procedural

28   bar); *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (in evaluating state court
     decisions, the federal habeas court looks through summary opinions to the last reasoned
     decision).

viii.     Ground Three (c)

Petitioner alleges that the prosecutor admitted mistakes were made and vouched for the State's incomplete investigation. Petitioner did not raise this claim on direct appeal but did allege the claim in his PCR proceedings[37] and petition for review to the COA.[38] (Exs. QQ and WW). Thus, because Petitioner fairly presented this claim to the state courts in a procedurally appropriate manner, the claim is exhausted. However, the claim is nevertheless procedurally defaulted because the Rule 32 court applied an express procedural bar when it found that all of Petitioner's prosecutorial misconduct claims were precluded as waived by Rule 32.2(a)(3) because they could have been raised earlier. (Ex. UU).

ix.     Ground Four

Petitioner alleges that he was denied the right to confront witnesses against him because John, Laughlin, and Steiner were not present at trial and that their absences violated his due process and compulsory process rights. Petitioner did not raise this claim on direct appeal. In his first PCR petition, Petitioner asserted a general violation of his Sixth Amendment right to compulsory process for witnesses not at trial. (Ex. OO at 57). In his second PCR petition, Petitioner alleged prosecutorial misconduct for the State allowing witnesses to be absent from trial without requesting telephonic appearances or following up on Laughlin's hospitalization. (Ex. QQ at 67). Petitioner also alleged that trial counsel was ineffective for failing to object to Laughlin's absence from trial or requesting a telephonic appearance as an alternative, and that appellate counsel was ineffective for failing to raise a claim that compulsory process was denied when Laughlin and John did not testify at trial. *Id.* at 69–70. In his petition for review to the COA, Petitioner again alleged prosecutorial misconduct for allowing John and Laughlin to be absent from trial. (Ex. WW at 6). Petitioner also alleged that trial counsel was ineffective for failing to protect

---

[37] Alleging prosecutorial misconduct because the State admitted it made mistakes in collecting evidence and the prosecutor vouched for the State's case by excusing officers' mistakes and stating the defense presented a smoke and mirrors case. (Ex. QQ at 67).
[38] Alleging the prosecutor vouched for the State's mistakes while saying the defense presented a smoke and mirrors case. (Ex. WW at 6).

1    Petitioner's due process and compulsory process rights, and failing to object to Laughlin's

2    and John's absences from trial. *Id.* at 7. Finally, Petitioner alleged appellate counsel was

3    ineffective for failing to raise a compulsory process claim for Laughlin's and John's

4    absences. *Id.* However, Petitioner presented these claims to the state courts as prosecutorial

5    misconduct or IAC claims. Petitioner did not raise the specific claim he now presents on

6    habeas: an independent confrontation clause claim alleging his due process and compulsory

7    process rights were violated because John, Laughlin, and Steiner were not present at the

8    trial.

9         The fact that Petitioner presented related prosecutorial misconduct and IAC claims

10   to the state courts is immaterial to exhaust the separate and distinct confrontation clause

11   claim that Petitioner makes here. *See Grey v. Netherland*, 518 U.S. 152, 162–63 (1996) (a

12   petitioner does not satisfy the exhaustion requirement "by presenting the state courts only

13   with the facts necessary to state a claim for relief[;]" the specific constitutional right

14   allegedly violated must also be identified); *Tamalini*, 249 F.3d at 898 (Sixth Amendment

15   right to counsel claim presented to state court did not exhaust Fourteenth Amendment due

16   process and equal protection claims made to circuit court); *Lopez v. Schriro*, 491 F.3d 1029,

17   1040 (9th Cir. 2007) ("in order to fulfill exhaustion requirements, a petitioner must present

18   to the state courts the substantial equivalent of the claim presented in federal court").[39]

19   _____

20   [39] As this Court has explained:

21        Fair presentation requires a petitioner to describe both the
         operative facts and the federal legal theory to the state courts.
22       *Reese*, 541 U.S. at 28, 124 S. Ct. 1347. It is not enough that all
         of the facts necessary to support the federal claim were before
23       the state court or that a "somewhat similar" state law claim was
         raised. *Reese*, 541 U.S. at 28, 124 S. Ct. 1347 (stating that a
24       reference to ineffective assistance of counsel does not alert the
         court to federal nature of the claim). Rather, the habeas
25       petitioner must cite in state court to the specific constitutional
         guarantee upon which he bases his claim in federal court.
26       *Tamalini v. Stewart*, 249 F.3d 895, 898 (9th Cir. 2001).
         Similarly, general appeals to broad constitutional principles,
27       such as due process, equal protection, and the right to a fair
         trial, are insufficient to establish fair presentation of a federal
28       constitutional claim. *Lyons v. Crawford*, 232 F.3d 666, 669
         (9th Cir. 2000), *amended on other grounds*, 247 F.3d 904 (9th
         Cir. 2001); *Shumway v. Payne*, 223 F.3d 982, 987 (9th Cir.

1   Accordingly, Ground Four is unexhausted because Petitioner failed to properly present it

2   to the state courts in a procedurally appropriate manner.[40] *See Baldwin*, 541 U.S. at 29;

3   *Castillo*, 399 F.3d at 998; *Crowell*, 483 F. Supp. at 931–33.

4          x.    Ground Five (b)

5          Petitioner alleges that he was denied the presumption of innocence because trial

6   exhibits showed Petitioner in a neck brace and handcuffed to the hospital bed when he had

7   no neck injuries and was not under arrest. Petitioner did not raise this claim on direct

8   appeal. The first PCR petition included a general claim of unconstitutional loss of

9   presumption of innocence (Ex. OO at 57), and the second PCR petition argued that

10  Petitioner was denied the presumption of innocence because the jury received photos of

11  Petitioner handcuffed to the hospital bed and wearing a neck brace but he did not have any

12  neck injuries (Ex. QQ at 66). Petitioner alleged the same claim that he made in the second

13  PCR petition in his petition for review to the COA. (Ex. WW at 5).

14         Thus, because Petitioner fairly presented this claim to the state courts in a

15  procedurally appropriate manner, the claim is exhausted. However, the claim is nonetheless

16  procedurally defaulted because the Rule 32 court applied an express procedural bar when

17  ───────────────────────

18          2000) (insufficient for prisoner to have made "a general appeal
    to a constitutional guarantee," such as a naked reference to
    "due process," or to a "constitutional error" or a "fair trial").

19          Likewise, a mere reference to the "Constitution of the United
    States" does not preserve a federal claim. *Gray v. Netherland*,

20          518 U.S. 152, 162–63, 116 S. Ct. 2074, 135 L.Ed.2d 457
    (1996). Even if the basis of a federal claim is "self-evident" or

21          if the claim would be decided "on the same considerations"
    under state or federal law, the petitioner must make the federal

22          nature of the claim "explicit either by citing federal law or the
    decision of the federal courts . . . ." *Lyons*, 232 F.3d at 668. A

23          state prisoner does not fairly present a claim to the state court
    if the court must read beyond the pleadings filed in that court

24          to discover the federal claim. *Baldwin*, 541 U.S. at 27, 124 S.
    Ct. 1347.

25  *Date*, 619 F.Supp.2d at 764–65; *see also Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If

26  state courts are to be given the opportunity to correct alleged violations of prisoners' federal
    rights, they must surely be alerted to the fact that the prisoners are asserting claims under

27  the United States Constitution.").
    [40] Even if Petitioner had properly exhausted his Ground Four claims in state court, the PCR

28  court rejected all of Petitioner's IAC claims for failure to state a colorable claim for relief,
    and further found that all of Petitioner's remaining claims were precluded as waived by
    Rule 32.2(a)(3) because they could have been raised earlier. (Ex. UU).

it found that all of Petitioner's claims, with the exception of his IAC claims, were precluded as waived by Rule 32.2(a)(3) because they could have been raised in an earlier proceeding. (Ex. UU).

xi.    Ground Five (c)

Petitioner alleges that he was subject to selective prosecution because Medina was a potential suspect and had severe injuries but the police collected no evidence from him, because Medina was allowed to testify against Petitioner, and because the police allowed Medina to access his truck before defense counsel had an opportunity to examine it. Petitioner did not raise this claim on direct appeal. Petitioner asserted a general claim of selective prosecution in his first PCR petition. (Ex. OO at 57). In his second petition Petitioner alleged that the State selectively prosecuted him and gave Medina preferential treatment by not charging Medina with drunk driving, not testing Medina's blood for DNA, not testing Medina's clothing for airbag residue or his clothing or hands for Petitioner's blood, withholding pictures of Medina's injuries from the jury, allowing Medina to disturb and tamper with evidence in the truck prior to any defense examination, and allowing Medina to testify against Petitioner. (Ex. QQ at 65–66). In his petition for review to the COA, Petitioner argued selective prosecution because the State did not collect evidence from Medina's person, allowed Medina to testify against Petitioner, and allowed Medina to access his truck—substantially the same claims Petitioner now raises on habeas. (Ex. WW at 5).

Thus, because Petitioner fairly presented this claim to the state courts in a procedurally appropriate manner, the claim is exhausted. However, the claim is nonetheless procedurally defaulted because the Rule 32 court applied an express procedural bar when it found that all of Petitioner's claims, with the exception of his IAC claims, were precluded as waived by Rule 32.2(a)(3) because they could have been raised earlier. (Ex. UU).

xii.    Ground Five (d)

Petitioner alleges that there was a 110-day pre-accusation delay between the incident and the indictment that allowed the State to not completely investigate all available

evidence; specifically, blood on the steering wheel and evidence from Medina. Petitioner did not raise this claim on direct appeal. In the first PCR petition, Petitioner alleged an unconstitutional pre-accusation delay claim. (Ex. OO at 57). In his second petition, Petitioner argued that the State violated his due process rights during a 110-day pre-accusation delay that allowed the State to not completely investigate all of the available evidence including blood on the steering wheel, Medina's blood and clothing, and a handprint on the car window, and the State allowed Medina to access his truck and retrieve property, disturbing the evidence before defense counsel could investigate it. (Ex. QQ at 65). In his petition for review to the COA, Petitioner alleged a pre-accusation delay where Medina was allowed to access his truck before an indictment or formal charges were filed, disturbing evidence before the defense could access it. (Ex. WW at 5).

Thus, to the extent that Petitioner fairly presented this claim to the state courts in a procedurally appropriate manner, the claim is exhausted. However, the claim is nonetheless procedurally defaulted because the Rule 32 court applied an express procedural bar when it found that all of Petitioner's claims, with the exception of his IAC claims, were precluded as waived by Rule 32.2(a)(3) because they could have been raised earlier. (Ex. UU).

xiii.    Ground Five (e)

Petitioner alleges that his due process rights were violated because the State failed to disclose the entirety of Cheryl Laughlin's 911 call. Petitioner did not raise this claim on direct appeal. In the first PCR petition, Petitioner made general allegations that the State had suppressed evidence and failed to complete discovery or produce evidence. (Ex. OO at 57). In his second petition, Petitioner alleged a prosecutorial misconduct claim because the State failed to disclose the tape or transcript of Laughlin's 911 call. (Ex. QQ at 67). Petitioner presented a similar claim in his petition for review to the COA, alleging prosecutorial misconduct for failing to collect and test all available evidence, including the 911 call. (Ex. WW at 6). Petitioner presented these claims to the state courts as prosecutorial misconduct claims but did not raise the specific claim he now presents on habeas: an independent due process violation. The fact that Petitioner presented related

prosecutorial misconduct claims to the state courts is immaterial to exhaust the separate and distinct due process clause claim that Petitioner makes here. *See Grey*, 518 U.S. at 162–63; *Tamalini*, 249 F.3d at 898; *Lopez*, 491 F.3d at 1040; *see also Rose v. Palmateer*, 395 F.3d 1108, 1112 (9th Cir. 2005) (where petitioner only mentioned the unlawfulness of his confession in support of his IAC claim on PCR, petitioner failed to fairly present Fifth Amendment claim to the state courts for purposes of federal habeas exhaustion; "[w]hile admittedly related, they are distinct claims with separate elements of proof, and each claim should have been separately and specifically presented to the state courts."). Accordingly, Ground Five (e) is unexhausted because Petitioner failed to properly present it to the state courts in a procedurally appropriate manner. *See Baldwin*, 541 U.S. at 29; *Castillo*, 399 F.3d at 998; *Crowell*, 483 F. Supp. at 931–33.[41]

### C. Effect of Procedural Bar

Claims not previously presented to the state courts on either direct appeal or collateral review are generally barred from federal review because any attempt to return to state court to present them would be futile unless the claims fit into a narrow range of exceptions. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(a) (precluding claims not raised on direct appeal or in prior post-conviction relief petitions), 32.4(a) (time bar), 32.9(c) (petition for review must be filed within thirty days of trial court's decision). Because these rules have been found to be consistently and regularly followed, and because they are independent of federal law, either their specific application to a claim by an Arizona court, or their operation to preclude a return to state court to exhaust a claim, will procedurally bar subsequent review of the merits of such a claim by a federal habeas court. *Stewart v. Smith*, 536 U.S. 856, 860 (2002); *Ortiz v. Stewart*, 149 F.3d 923, 931–32 (9th Cir. 1998) (Rule 32 is strictly followed); *State v. Mata*, 916 P.2d 1035, 1050–52 (Ariz. 1996) (waiver and preclusion rules strictly applied in post-conviction proceedings).

As explained above, several of Petitioner's claims are unexhausted because

---

[41] Even assuming that Petitioner did properly exhaust the claim, the claim is nonetheless procedurally defaulted because the Rule 32 court applied an express procedural bar when it found that all of Petitioner's claims, with the exception of his IAC claims, were precluded as waived by Rule 32.2(a)(3) because they could have been raised earlier. (Ex. UU).

Petitioner failed to properly present them to the state courts in a procedurally appropriate manner. Arizona Rules of Criminal Procedure regarding timeliness and preclusion prevent Petitioner from now exhausting those claims in state court. Accordingly, the claims are both technically exhausted and procedurally defaulted and thus not properly before this Court for review. *See Crowell*, 483 F. Supp. 2d at 931–33; *Coleman*, 501 U.S. at 732, 735 n.1; *Garcia*, 2013 WL 4714370 at * 8. Additionally, some of Petitioner's claims were actually raised in state court and thus properly exhausted, but are nonetheless procedurally barred from this Court's review because the state court applied a plain procedural bar and found the claims were precluded as waived by Rule 32.2(a)(3). *See Coleman*, 501 U.S. at 729–30.

A federal court may not consider the merits of a procedurally defaulted claim unless the petitioner can demonstrate cause for his noncompliance and actual prejudice, or establish that a miscarriage of justice would result from the lack of review. *See Schlup v. Delo*, 513 U.S. 298, 321 (1995). Both cause and prejudice must be shown to excuse a procedural default, but the Court is not required to examine the existence of prejudice if the petitioner fails to establish cause. *Engle*, 456 U.S. at 134 n.43; *Thomas*, 945 F.2d at 1123 n.10.

i.   Cause and Prejudice

In a memorandum attached to his PWHC, Petitioner provides several reasons that he alleges constitute cause to excuse the procedural default of his claims.

First, Petitioner states that "the shock of this ordeal has not worn off" and has affected his "mental process to decipher claims of facts from feelings and questions of law from claims for relief, much less decipher the more complicated matters such as cause and prejudice from grounds for relief." (Doc. 7 at 160). In general, mental incompetence is insufficient to establish cause because it is not a factor external to the defense. *See Schneider v. McDaniel*, 674 F.3d 1144, 1154 (9th Cir. 2012) ("[A] pro se petitioner's mental condition cannot serve as cause for a procedural default, at least when the petitioner on his own or with assistance remains 'able to apply for post-conviction relief to a state

court.'" (quoting *Hughes v. Idaho State Bd. of Corr.*, 800 F.2d 905, 909 (9th Cir. 1986))); *see also Tacho v. Martinez*, 862 F.2d 1376, 1381 (9th Cir. 1988) (petitioner's arguments concerning his mental health and reliance upon jailhouse lawyers did not constitute cause). Here, Petitioner has demonstrated an ability to file both state and federal petitions, and his general allegation that shock from the ordeal has affected his mental processes is insufficient to establish cause. *See Schneider*, 674 F.3d at 1154 ("a pro se petitioner might demonstrate cause in a situation where a mental condition rendered the petitioner completely unable to comply with a state's procedures and he had no assistance").

Second, Petitioner alleges that apparently everyone "missed the fact that there is no motive to leave the scene of an accident because of a status in society (parole) when you have life threatening injuries so great that you are [non-ambulatory]," and that the "mind boggling complexities" of the constitutional issues related to this claim are such that it is "unfathomable to require a layman to present this in a cognizable manner." (Doc. 7 at 162, 164). Petitioner's status as an inmate and lack of legal knowledge do not constitute cause. *See Lewis v. Casey*, 518 U.S. 343, 355 (1996) (The right of access to the courts "does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration."); *see also Hughes*, 800 F.2d at 908 (petitioner's pro se status and ignorance of the law do not satisfy the cause standard). Further, while Petitioner alleges that "mind boggling complexities" make it "unfathomable" to require him to present his claims in a cognizable manner, the record reflects that Petitioner has been able to adequately articulate his claims to the courts. *See Thomas*, 945 F.2d at 1123 (petitioner's filing of pro se pleadings reflected adequate access to and use of legal materials). Moreover, the argument that Petitioner alleges everyone missed—that his motive for leaving the scene was his severe injuries, not his parole

status—is precisely the argument defense counsel made at trial.

Third, Petitioner states that not one attorney assigned to his case has been able to marshal the facts from the record, and with an eighth-grade education, he is unable to present the truth. (Doc. 7 at 164–165). Petitioner's lack of education is insufficient to establish cause. *See Cornman v. Armontrout*, 959 F.2d 727, 729 (8th Cir. 1992) (that "petitioner may possess below-average intelligence, have no formal legal training, or have filed the initial habeas petition pro se" is not enough to excuse procedural default); *see also Hughes*, 800 F.2d at 909 (petitioner's alleged illiteracy insufficient to establish cause for failure to timely appeal to state supreme court); *Bonilla v. Hurley*, 370 F.3d 494 (6th Cir. 2004) (pro se status, ignorance of law and procedural requirements, limited access to prison library, and unfamiliarity with the English language insufficient to establish cause); *Harris v. McAdory*, 334 F.3d 665, 669 (7th Cir. 2003) (borderline IQ is not external to the defense and does not establish cause); *Steele v. Young*, 11 F.3d 1518, 1522 (10th Cir. 1993) (pro se petitioner and his deficiencies in reading and writing skills were not external factors constituting "cause" for procedural default); *Smith v. Newsome*, 876 F.2d 1461, 1465 (11th Cir. 1989) (low IQ did not mean petitioner was mentally incompetent or unable to raise arguably valid claim; "being illiterate does not mean that the person lacks good sense[, n]or does lack of formal education make a person mentally incompetent").

Fourth, Petitioner claims that he is incapable of learning how to determine a viable claim for relief because the prison library does not have access to law books that demonstrate viable issues, and that the paralegal program has problems that render it useless and futile to pursue—specifically, it would be too difficult to move all the disclosure to the area to meet with the paralegal, and the inmates consider the program a joke. (Doc. 7 at 165–166). "[A]n inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense . . . 'meaningful access to the courts is the touchstone,' and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Lewis*, 518

U.S. 343 at 351 (internal citation omitted). Despite Petitioner's protestations, the record reveals that he has been able to adequately articulate his claims, and his pleadings are replete with citations to case law and statutes, thus reflecting adequate access to and use of legal materials. *See Thomas*, 945 F.2d at 1123 (despite complaints of inadequate law library and legal assistance procedures, petitioner's pleadings reflected knowledge of applicable statutes, cases and court rules). Relatedly, Petitioner's choice to not meet with the paralegal because he thinks it would be useless or too difficult to do so does not constitute cause.

Fifth, Petitioner claims that it would make little sense to require him to present every ground for relief on habeas that he presented to the state courts without first deciding his claim of actual innocence, and that to require him to produce anything else not associated with his claim of innocence would require him to address the complexities of the case without access to certain law books. (Doc. 7 at 173). Again, Petitioner's pleadings demonstrate that he has been able to pursue his claims for relief in the state courts and timely file his habeas petition in this Court, and his citations to case law and statutes reflect adequate access to and use of legal materials. Petitioner's assertion that it would make little sense to present all claims until this Court addresses his claim of actual innocence does not relieve Petitioner of the requirements of § 2254. Further, the issue of cause goes not to what claims Petitioner presents in his PWHC, but is a means to excuse the procedural default of his claims in state court and thereby lift the bar to federal habeas review of the defaulted claims.

In his Reply to Respondents' Answer, Petitioner presents additional arguments as cause to excuse the procedural default of his claims. Petitioner first notes that the Answer includes a list of proceedings that Respondents do not have transcripts for and contends that this suggests government interference violating due process. (Doc. 17 at 2–3) (citing Doc. 14 at 5). Petitioner alleges that withholding these documents in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), constitutes a per se excuse establishing cause and prejudice for the procedural default of his claims.[42] *Id.* at 2. While government concealment or

---

[42] For procedural default purposes, "cause and prejudice parallel two of the three components of the alleged *Brady* violation itself." *Woods v. Sinclair*, 764 F.3d 1109, 1130

suppression of evidence may establish cause for a petitioner's failure to develop his claim in state court, *Banks v. Dretke*, 540 U.S. 668, 691 (2004), Petitioner cannot argue "cause" to excuse the default of his claims in *state* court simply because the answer filed in *federal* court notes that Respondents do not have transcripts of certain proceedings. Relatedly, Petitioner alleges that counsel was impeded from presenting issues to the state courts because of the government interference in not providing the records from all proceedings. (Doc. 17 at 3). Cause may be established if the state fails to provide transcripts or records needed to fairly present a federal claim to the state courts and there were no reasonably available alternative sources of information. *See, e.g.*, *Doorman v. Wainwright*, 798 F.2d 1358, 1369–1370 (11th Cir. 1986); *Forest v. Delo*, 52 F.3d 716, 720–721 (8th Cir. 1995). Here, however, Petitioner does not make any specific allegations as to what information was supposedly withheld that prevented counsel from presenting claims to the state courts, nor does Petitioner specify what those claims would have been. Petitioner's generalized allegations are hardly sufficient to explain his failure to properly exhaust his claims in state court.

Petitioner further alleges that he had no control over the issues that appellate counsel presented and that counsel rejected the list of issues Petitioner sent her. (Doc. 17 at 26). Criminal defendants have a constitutional right to the effective assistance of counsel at trial and for all direct appeals that the state grants as a matter of right. *Evitts v. Lucey*, 469 U.S. 387, 393 (1985). Thus, "[a]ttorney error that constitutes ineffective assistance of counsel is cause [to excuse a procedural default]." *Coleman*, 501 U.S. at 753–754. However, "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Murray*, 477 U.S. at 486; *see also Coleman*, 501 U.S. at 753 ("Attorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of

---

(9th Cir. 2014) (internal quotations and citations omitted). "A petitioner may establish cause by showing that the prosecution's suppression of evidence was the reason for the petitioner's failure to develop the factual basis of the claim in state court." *Id*. "Prejudice is established by showing that the suppressed evidence is material for *Brady* purposes." *Id*.

attorney error.'" (citation omitted)). For attorney error to constitute "cause," it must rise to the level of a constitutional violation of the right to counsel under *Strickland*. *Murray*, 477 U.S. at 488. Thus, whether the error occurs at trial or on appeal, "cause for a procedural default . . . requires a showing of some external impediment preventing counsel from constructing or raising the claim." *Id.* at 492.

Here, appellate counsel reviewed the record to determine whether there were any viable claims for appeal and chose to present one issue: whether it was reversible, fundamental error for the trial court to admit evidence of Petitioner's parole status without giving a limiting instruction. Although Petitioner avers that he sent counsel a 13-page letter of issues to pursue on appeal, an "attorney need not advance every argument, regardless of merit, urged by the appellant." *Evitts*, 469 U.S. at 394; *see also Gustave v. United States*, 627 F.2d 901, 904 (1980) ("Mere criticism of a tactic or strategy is not in itself sufficient to support a charge of inadequate representation."); *Strickland*, 466 U.S. at 690 ("[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"); *Sexton*, 679 F.3d at 1157 ("Counsel is not necessarily ineffective for failing to raise even a nonfrivolous claim, so clearly we cannot hold counsel ineffective for failing to raise a claim that is meritless. Accordingly, a PCR counsel would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective." (internal citation omitted)). Counsel is presumed to have acted reasonably, and appellate counsel likely evaluated the merits of additional claims and made a tactical decision not to pursue them. As is discussed further in Section D below, Petitioner has failed to show that appellate counsel was constitutionally ineffective and thus any alleged error by appellate counsel cannot serve as cause to excuse the procedural default of Petitioner's claims.

Finally, Petitioner alleges that he did not receive a fair trial due to unjust grand jury proceedings, an incomplete investigation, prosecutorial misconduct, ineffective assistance of trial counsel, and a biased trial judge, therefore supporting cause and prejudice for the procedural default of his claims. (Doc. 17 at 71). Petitioner appears to misunderstand the

standard. A showing of cause and prejudice serves to excuse the procedural default of a claim that is barred from federal habeas review. The cause must be some external factor that prevented Petitioner from timely raising his federal claims to the state courts in a procedurally appropriate matter, such as interference by officials that makes compliance with the state's procedural rule impracticable, a showing that the factual or legal basis for the claim was not reasonably available, or that the procedural default was the result of ineffective assistance of counsel. *Murray*, 477 U.S. at 488–489. Petitioner's allegations of an unfair trial go to the substance of his claims for relief but do not explain the *why* of Petitioner's failure to properly present his federal constitutional claims to the state courts.

In sum, none of Petitioner's alleged reasons are sufficient to constitute cause excusing the procedural default of his claims. While the standard for cause and prejudice is one of discretion and is intended to be flexible, it must yield to exceptional circumstances only. *Hughes*, 800 F.2d at 909. Petitioner bears the responsibility for failing to raise his claims in a timely, properly filed state proceeding and properly exhausting those claims to the Arizona COA. *See Williams v. Taylor*, 529 U.S. 420, 437 (2000) ("Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings."). Accordingly, because Petitioner has failed to establish cause to excuse the procedural default of his claims, the Court need not examine the merits of Petitioner's defaulted claims or the purported prejudice.

ii.     Fundamental Miscarriage of Justice

A federal court may review the merits of a procedurally defaulted habeas claim if the petitioner demonstrates that failure to consider the merits of his claim will result in a "fundamental miscarriage of justice." *Schlup*, 513 U.S. at 327. A "fundamental miscarriage of justice" occurs when a constitutional violation has probably resulted in the conviction of one who is actually innocent. *Id.* This "exception is concerned with actual as compared to legal innocence," and is thus narrow in scope. *Sawyer v. Whitley*, 505 U.S. 333, 339–40 (1992). Actual innocence thereby serves as a "gateway" for a petitioner to have procedurally or time-barred constitutional claims reviewed. *McQuiggin v. Perkins*, 569

U.S. 383, 386 (2013); *Smith v. Baldwin*, 510 F.3d 1127, 1139–49 (9th Cir. 2007) (en banc) (A claim of innocence under *Schlup* is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.").

To support a claim of actual innocence a petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. "Given the rarity of such evidence, 'in virtually every case, the allegation of actual innocence has been summarily rejected.'" *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324). Thus, the "precedents holding that a habeas petitioner satisfied [the *Schlup* standard] have typically involved dramatic new evidence of innocence." *Larsen v. Soto*, 742 F.3d 1083, 1095–96 (9th Cir. 2013).

In order to pass through the *Schlup* gateway, a petitioner's case must be "truly extraordinary," 513 U.S. at 327, and a "tenable actual-innocence gateway" claim will not be found unless the petitioner "persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin*, 569 U.S. at 386 (citing *Schlup*, 513 U.S. at 329). A showing that a reasonable doubt exists in light of the new evidence is not sufficient; rather, the "petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S at 327; *see also Lorentsen v. Hood*, 223 F.3d 950, 954 (9th Cir. 2000) ("Petitioner bears the burden of proof on this issue by a preponderance of the evidence, and he must show not just that the evidence against him was weak, but that it was so weak that 'no reasonable juror' would have convicted him.").

Here, Petitioner alleges that the evidence of his actual innocence is so strong that it is enough to demonstrate a fundamental miscarriage of justice occurred, violating nearly every constitutional right at every stage of the proceedings. (Doc. 7 at 172). Petitioner

specifically contends that, based on Kendrick John's interview, the facts underlying his claims for relief are sufficient to establish by clear and convincing evidence that, but for the constitutional violations in his case, no reasonable fact finder would have found Petitioner guilty. (Doc. 17 at 14). However, as discussed above in Section A(i), the statements Petitioner relies on in John's interview do not establish who was driving the truck at the time of the fatal collision.[43] John made several vague and inconsistent statements that Medina left in the truck, that John woke up and Medina was gone and the truck was gone, and that John didn't want his friend to get in trouble for drinking and driving. *See* Doc. 7-1 Ex. I. While John's statements may have cast some doubt on the State's theory of the case, John's interview does not prove that Medina *was* the driver at the time of the fatal accident, or that Petitioner *was not* the driver at the time of the fatal accident. Although a *Schlup* gateway claim does not require affirmative proof of innocence, a petitioner cannot merely attempt to discredit the state's case and must affirmatively present new, exculpatory evidence. *Sistrunk v. Armenakis*, 292 F.3d 669, 673, 676 (9th Cir. 2002); *Larsen*, 742 F.3d at 1095–96 ("[E]vidence [that] casts doubt on the conviction by undercutting the reliability of the proof of guilt, but not by affirmatively proving innocence, . . . can be enough to pass through the *Schlup* gateway . . . [; however, the court has] denied access to the *Schlup* gateway where a petitioner's evidence of innocence was merely cumulative or speculative or was insufficient to overcome otherwise convincing proof of guilt."). Here, even if the jury had been presented with John's interview statements, the undersigned cannot say that John's statements constitute evidence of innocence so strong as to undermine confidence in the proof of Petitioner's guilt. Rather, the jury would still have been likely to convict based on the totality of the evidence presented at trial, such as the DNA evidence implicating Petitioner as the driver

---

[43] Furthermore, as discussed in Section D(iii) below, John gave several contradictory statements across several interviews, was not forthcoming with information, and claimed inability to remember much of what happened.

of the truck[44] and eyewitness testimony[45] that placed Petitioner and his wife at the scene of the fatal accident. Thus, the undersigned cannot say that, had John's interview statements been disclosed to the jury, and in light of the other evidence at trial, that no reasonable juror would have voted to convicted Petitioner. *Compare Larsen*, 742 F.3d at 1096 (*Schlup* gateway satisfied where petitioner produced five witnesses who were not called at trial and who gave credible testimony that someone other than petitioner committed the acts for which he was convicted and sentenced), *with Griffin v. Johnson*, 350 F.3d 956, 965 (9th Cir. 2003) (petitioner's newly submitted psychological report insufficient to establish actual innocence where it was highly unlikely the jury would have reached a different result based on the report in light of other conflicting psychiatric evidence), *Albrecht v. Horn*, 485 F.3d 103, 125 (3d Cir. 2007) (actual innocence standard not satisfied where "[t]he substantial remainder of the Commonwealth's case has not been discredited and provides ample evidence of guilt[,]" despite defense expert and lay witness testimony that contradicted prosecution's theory of the case), *Moore-El v. Luebbers*, 446 F.3d 890, 903 (8th Cir. 2006) (actual innocence standard not satisfied where, at most, testimony of possible eyewitness "would have established conflicting testimony among purported eyewitnesses to the murder, a circumstance that already existed"), *and Johnson v. Norris*, 170 F.3d 816, 819 (8th Cir. 1999) (actual innocence standard not satisfied where much of the evidence petitioner relied on, including a witness's memory loss and potentially conflicting testimony of witnesses, was "not new and reliable").

---

[44] Petitioner's blood was found on the truck's driver's side door, driver's side headrest, center console, and deployed driver's side airbag. (Ex. O at 576:25–577:1, 581:13–20). Detective LaBenz testified that the bloodstain on the airbag could have only been deposited after the collision when the airbag deployed. (Ex. P at 692:20–22). He further stated that there was no evidence of blood in the backseat. *Id.* at 695:5–16.

[45] Karin Copeland testified that she called 911 to report the car accident. (Ex. M at 324–25). The pickup truck was in her front yard and she saw two people right in front of the truck leaving. *Id.* at 328–29. Right on the other side, she saw a white car with the back-passenger door open. *Id.* at 329. Karin asked the people if they were ok, but the woman did not respond. *Id.* at 329; 337. Karin saw the woman get the man to the back-passenger door and then the woman went to the driver's side and was yelling "get in." *Id.* at 330. Karin was reading the license plate to the 911 operator when the car drove away with the back door still open. *Id.* The driver turned on the right blinker, then turned off the lights and turned left. *Id.* at 331. Karin didn't get a good look at the people, but the woman was blond and shorter than the man. *Id.* at 336. The man seemed to be in great pain and like he was confused about how to get into the car. *Id.* at 336–38.

In sum, while Petitioner challenges the constitutional adequacy of the procedures that led to his convictions and sentences and the fairness of those proceedings, he does not point to the kind of new evidence contemplated by the Supreme Court such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Schlup*, 513 U.S. at 324. Thus, the undersigned finds that Petitioner has not offered any new reliable evidence of actual innocence sufficient to establish that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. Accordingly, Petitioner has not shown that review of his procedurally-barred claims is warranted under *Schlup*.

**D. Merits**

Petitioner's remaining claims allege ineffective assistance of trial counsel and appellate counsel.

i.   Legal Standard

The Supreme Court established a two-part test for evaluating IAC claims in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish that counsel was ineffective under *Strickland*, Petitioner must show: (1) that trial counsel's performance was deficient; and (2) that trial counsel's deficient performance prejudiced Petitioner's defense. *Ortiz v. Stewart*, 149 F.3d 923, 932 (9th Cir. 1998) (citing *Strickland*, 466 U.S. at 688, 694). To establish deficient performance, Petitioner must show that "counsel made errors so serious . . . that counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 687–688. The relevant inquiry is not what defense counsel could have done, but rather whether the decisions made by defense counsel were reasonable. *Babbit v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). In considering this factor, counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690.

The Ninth Circuit "h[as] explained that '[r]eview of counsel's performance is highly deferential and there is a strong presumption that counsel's conduct fell within the wide

range of reasonable representation.'" *Ortiz*, 149 F.3d at 932 (quoting *Hensley v. Crist*, 67 F.3d 181, 184 (9th Cir. 1995)). "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances[.]" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Additionally, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Acts or omissions that "might be considered sound trial strategy" do not constitute ineffective assistance. *Id.*

Even where trial counsel's performance is deficient, Petitioner must also establish prejudice in order to prevail on an IAC claim. To establish prejudice, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Under the prejudice factor, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. "The likelihood of a different result must be substantial, not just conceivable." *Richter,* 562 U.S. at 112. Further, because failure to make the required showing of either deficient performance or prejudice defeats the claim, the court need not address both factors where one is lacking. *Strickland*, 466 U.S. at 697–700; *LaGrand v. Stewart*, 133 F.3d 1253, 1270 (9th Cir. 1998) (a court need not look at both deficiency and prejudice if the petitioner cannot establish one or the other).

Additionally, under the AEDPA, the federal court's review of the state court's decision on an IAC claim is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 698–699 (2002). This creates a "doubly deferential" review standard in which a habeas petitioner must show not only that there was a violation of *Strickland*, but also that the state court's resolution of the claim was more than wrong, it was an objectively unreasonable application of *Strickland*. *See Yarborough v. Gentry*, 540 U.S. 1, 6 (2003);

*Bell*, 535 U.S. at 698–99; *Woodford*, 537 U.S. at 25; *Cullen v. Pinholster*, 563 U.S. 170, 171 (2011) (federal habeas court's review of state court's decision on ineffective assistance of counsel claim is "doubly deferential"). Thus, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 105.

Finally, where the state court decides the merits of a claim without providing its rationale, the federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981–82 (9th Cir. 2000) ("Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law."). Although the record is reviewed independently, the federal court nevertheless defers to the state court's ultimate decision. *Pirtle*, 313 F.3d at 1167; *see also Himes*, 336 F.3d at 853.

ii.     Ground Two (a)

Petitioner alleges that trial counsel was ineffective for failing to secure Cheryl Laughlin as a witness or object to her absence at trial, and failing to request that she appear telephonically. As explained above, with the exception of the telephonic appearance portion of the claim, this claim is properly exhausted and will be reviewed on the merits.

In denying Petitioner's Rule 32 petition, the trial court broadly categorized all of Petitioner's claims as either IAC or prosecutorial misconduct but did not address each specific argument that Petitioner presented. As to the IAC claims, the court found that Petitioner failed to state any colorable claims for relief under *Strickland* because Petitioner failed to show that counsel's performance was deficient or that the alleged deficiencies prejudiced him. (Ex. UU at 173–174). The court stated that there was a strong presumption that counsel's actions fell within the broad range of reasonable conduct and that Petitioner failed to demonstrate that counsel's actions fell outside of this range or were otherwise deficient. *Id.* at 174. The court also found that Petitioner failed to show prejudice, stating

that the "petition nowhere establishes that, had counsel done any or all of the things Defendant says should have been done, that the outcome would have been any different." *Id.* The court further commented that "given Defendant's theory of the case—that he confronted two intoxicated individuals who attempted to carjack his wife's car and yet *somehow he ended up being driven from the scene by one of the carjackers in the carjackers' truck*—showing prejudice is virtually impossible." *Id.*

In denying relief on Petitioner's petition for review, the Arizona COA did not specifically address Petitioner's IAC claims, but stated that it had "reviewed the record in this matter, the superior court's order denying the petition for post-conviction relief, and the petition for review[,]" and found that Petitioner had "not established an abuse of discretion." (Ex. DDD at 25).[46]

For purposes of federal habeas review, Petitioner bears the burden of showing that the PCR court, in ruling that trial counsel was not ineffective, applied *Strickland* in an objectively unreasonable manner. In making this determination, "the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Richter*, 562 U.S. at 105. Here, the state court's finding that Petitioner's claim that trial counsel was ineffective for failing to secure Laughlin as a witness or object to her absence was without merit is supported by the record before this Court and was not an unreasonable application of *Strickland*.

"[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative." *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002). A petitioner may not use self-serving speculation to argue that a witness might have provided favorable testimony, but must

---

[46] "AEDPA directs federal courts to train their attention on the particular reasons why each state court that considered a prisoner's claims denied relief. When more than one state court has adjudicated a claim, the federal court analyzes the last 'reasoned' state court decision." *Curiel v. Miller*, 830 F.3d 864, 869 (9th Cir. 2016) (quoting *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005)). However, where "the last reasoned decision adopted or substantially incorporated the reasoning from a previous decision . . . it [is] reasonable for the reviewing court to look at both decisions to fully ascertain the reasoning of the last decision." *Barker*, 423 F.3d at 1093; *see also Robinson*, 360 F.3d at 1055 (in evaluating state court decisions, the federal habeas court looks through summary opinions to the last reasoned decision).

1    adduce evidence to show what the witness's testimony would have been. *Grisby v.*

2    *Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997); *see also United States v. Ashimi*, 932 F.2d

3    643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must

4    generally be presented in the form of actual testimony by the witness or on affidavit. A

5    defendant cannot simply state that the testimony would have been favorable; self-serving

6    speculation will not sustain an ineffective assistance claim."). Further, a "difference of

7    opinion as to trial tactics . . . alone generally does not constitute a denial of effective

8    assistance of counsel." *U.S. v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981); *see also Gustave*

9    *v. U.S.*, 627 F.2d 901, 904 (1980) ("Mere criticism of a tactic or strategy is not in itself

10   sufficient to support a charge of inadequate representation."); *Strickland*, 466 U.S. at 689

11   (acts or omissions that "might be considered sound trial strategy" do not constitute

12   ineffective assistance of counsel).

13          Here, Petitioner's argument is that counsel should have done more to ensure Cheryl

14   Laughlin was available to testify at trial. The record reflects that Laughlin was scheduled

15   to be called as a witness for the State (Ex. J at 155: 23) and the prosecutor referred to her

16   anticipated testimony during opening statements (Ex. M at 300:20–301:5). However, on

17   the third day of trial, the prosecutor informed the court that he had received a message from

18   Laughlin's husband/boyfriend that he had rushed her to the ER the day before and she

19   would not be able to testify. (Ex. N at 408:17–23). The court asked if defense counsel

20   wanted to be heard on that issue, and counsel replied "No . . . there may be nothing we can

21   do." *Id.* at 409:2–6. Counsel then said, "I don't know if Mr. Serden wants to keep it open

22   a couple days." *Id.* at 409:6–7. The prosecutor explained that based on the information he

23   had, it was "not going to be a couple of days," and Laughlin would not be available for

24   trial. *Id.* at 409:8–10. The court then granted the State's request—with no objection from

25   defense counsel—that the jury be informed that Laughlin was no longer available to testify

26   due to a medical emergency. *Id.* at 409:10–14, 410:9–15.

27          When defense counsel learned that Laughlin was not available, he had to make a

28   strategic decision based on the information that he had about whether to object to the trial

proceeding without Laughlin. Given that trial had already begun, and it was unclear how long Laughlin would be unavailable for, it was reasonable for counsel to determine that there didn't appear to be anything that he or the prosecutor could do about Laughlin's absence. Laughlin was a witness for the State, and counsel may have also reasoned that Laughlin's testimony would not be helpful to the defense. Even if counsel had objected to Laughlin's absence and requested some remedy, there is no guarantee that the trial court would have granted such a request. Thus, the undersigned finds that trial counsel's decision not to object to Laughlin's absence or make other efforts to secure her as a witness "falls within the wide range of reasonable professional conduct." *Strickland*, 466 U.S. at 689.

Further, any allegations of what Laughlin might have said if she had testified are pure speculation, and Petitioner has provided no affidavit or other evidence to show that Laughlin's testimony would have been favorable to the defense. Given that Laughlin was the State's witness, it is unlikely that her testimony would have bolstered the defense theory at trial. During opening statements, the prosecutor stated that Laughlin called 911 to report that there were two intoxicated men in the road, one injured, and that she saw a white car, possibly a Lincoln, at the scene, but the car left before she could get the license plate. (Ex. M at 300:20–301:5). Detective LaBenz interviewed Laughlin and wrote a summary of her statement:[47]

> Cheryl said she and Jeffery Steiner had just left their place at
> 9321 East Pueblo Avenue in her car and were driving east on

---

[47] Federal court "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181; *see also Murray v. Schriro*, 745 F.3d 984, 998 (9th Cir. 2014) ("Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1)."). It is unclear what documents Petitioner may have included with his state court filings that the state courts would have considered in ruling on the merits of Petitioner's claims. While the undersigned does not propose to expand the record on habeas review, the undersigned cites to the documents Petitioner included with his PWHC to provide relevant background information supporting the undersigned's conclusion that the state court's finding that Petitioner's IAC claims were without merit was not an objectively unreasonable application of *Strickland*. *See* Rule 7, Rules Governing § 2254 Cases (if a PWHC is not dismissed, "the judge may direct the parties to expand the record by submitting additional materials relating to the petition"); *see also Jamerson v. Runnels*, 713 F.3d 1218, 1226–27 (9th Cir. 2013) (in considering *Batson* claim, *Pinholster* does not bar court from considering reconstructed evidence of jury venire that was actually presented to the state court).

1

> Pueblo Avenue. She said the red car was now registered to her
> current boyfriend . . .

2

> As they approached the intersection with 96th Street she saw a
> white vehicle pull away from the east side of the intersection
> heading westbound and there were two bodies lying in the
> roadway. She said both the front and rear driver's side doors
> were open on the vehicle, then they both closed and the vehicle
> drove away. She thought there were two people who got in the
> car, but was not sure. She saw the car turn and go north on 96th
> Street.

3

4

5

6

7

> Cheryl made Jeffery stop the car so she could help the people
> in the road. She indicated that Jeffery did not want to get
> involved because he was on probation and did not want to get
> in trouble or have Law Enforcement contact.

8

9

> There were two Native American men lying in the road. Both
> appeared to be hurt. She helped them out of the road and then
> called 911, but did not know the time of the call. After calling
> for help, she remained on the scene until emergency responders
> arrived. She spoke with a deputy and then left.[48]

10

11

12

13

(Doc. 7-1 at 19–20). LaBenz also noted that he "asked Cheryl if she saw a pick-up truck or

14

any other vehicles in the area. She said the only vehicle she saw was the car." *Id.* at 20.

15

Laughlin did not see the fatal accident, did not see Medina's truck, and did not see anyone

16

driving the truck. She saw a white car drive away but was not sure if she saw one or two

17

people get in the car. There is little—if anything—this information does to bolster

18

Petitioner's defense. Rather, Laughlin's statements that she saw a white car drive away and

19

"two Native American men" injured and lying in the road support the State's theory that

20

Medina and John stayed at the fight scene, Shirley Chavez left in the Lincoln, and Petitioner

21

took off in Medina's truck and caused the fatal accident.[49] Thus, even if Laughlin had

22

testified, Laughlin's testimony would not have been favorable to the defense. Petitioner

23

fails to advance any credible argument to persuade the Court otherwise.

24

Therefore, while the Court is not required to consider prejudice because Petitioner

25

---

[48] Deputy Antwiler's report documents that he spoke with a female at 96th and Pueblo. (Doc. 7-1 at 36). When Antwiler arrived at the scene he saw two men and a woman in the middle of the street. The men identified themselves with their Arizona identification cards as Medina and John. Antwiler spoke with the woman and asked her what happened. She said she was driving by, heard yelling and screaming, saw the two men, and stopped to help. She did not remain on the scene long enough to be identified.

26

27

[49] Detective LaBenz also spoke with Jeffrey Steiner, whose statement mirrors Cheryl Laughlin's. *See* Doc. 7-1 at 22–23.

28

has failed to show that counsel's performance was deficient, the undersigned further finds that Petitioner has not shown a reasonable probability that Laughlin's testimony would have probably changed the verdict. The undersigned has thoroughly reviewed the record, including the transcripts from Petitioner's trial, and it contains ample evidence to support the jury's verdicts. Petitioner cannot show a substantial likelihood that the result would have been different had Laughlin testified at trial.

Accordingly, the state court's finding that Petitioner's IAC claim was without merit is supported by the record before this Court and was not an objectively unreasonable application of *Strickland*. The undersigned therefore recommends that the District Court deny relief on Ground Two (a).

iii.    Ground Two (c)

Petitioner alleges that trial counsel was ineffective for failing to object to Kendrick John's absence at trial and allowing the trial to proceed without him as a witness, and counsel did not move the State to bring John to justice on his active warrants. In the second PCR petition, Petitioner did not raise a specific claim regarding John in his list of claims for relief based on trial counsel's alleged ineffectiveness. *See* Ex. QQ at 69–70. However, in the argument section of his petition, Petitioner addressed trial counsel's and appellate counsel's alleged deficiencies and specifically alleged that trial counsel should have moved the State to bring John to justice for the active warrants he had at the time of Petitioner's trial. *Id.* at 89–90. In his petition for review to the COA, Petitioner then made the specific claim that trial counsel was ineffective for failing to investigate and object to John's absence at trial. (Ex. WW at 7). Thus, construing Petitioner's pleadings liberally, Petitioner has properly exhausted the claim he now makes in Ground Two (c).

As noted above, the trial court found that Petitioner failed to state any colorable claims for relief under *Strickland* because Petitioner failed to show that counsel's performance was deficient or that the alleged deficiency prejudiced him. (Ex. UU at 173–74). In denying relief on Petitioner's petition for review, the Arizona COA did not specifically address Petitioner's IAC claims, but found that Petitioner had failed to

establish that the trial court abused its discretion in denying the Rule 32 petition. (Ex. DDD at 25). For purposes of federal habeas review, Petitioner bears the burden of showing that the state court, in ruling that trial counsel was not ineffective, applied *Strickland* in an objectively unreasonable manner. Here, the undersigned concludes that the state court's finding that trial counsel was not ineffective for failing to secure John as a witness or object to his absence is supported by the record before this Court and was not an unreasonable application of *Strickland*.

When reviewing a claim of IAC, this Court "begin[s] with the premise that under the circumstances, the challenged action [] might be considered sound trial strategy . . . [and w]e affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did." *Elmore v. Sinclair*, 799 F.3d 1238, 1248–49 (9th Cir. 2015) (second and fifth alterations in original) (internal quotations and citations omitted). "As long as defense counsel uses a sound trial strategy, employing that strategy does not constitute deficient performance." *Elmore*, 799 F.3d at 1250 (internal quotations and citation omitted). Further, "[no decision of the Supreme Court] suggests . . . that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). To require otherwise would "seriously undermine[] the ability of counsel to present the client's case in accord with counsel's professional evaluation." *Id.*

Here, Petitioner alleges that trial counsel was ineffective for failing to secure John as a witness for trial and not objecting to John's absence. Petitioner further alleges that counsel should have compelled the State to secure John's appearance by detaining John on his outstanding warrants. The record reflects that John was listed as a potential witness in the State's Notice of Discovery. (Ex. B at 12). During opening statements at trial, Petitioner's counsel told the jury John was possibly a witness to what happened at the fight scene after Ms. Chavez left, but that John was not available because he had outstanding warrants and was hiding out on the reservation. (Ex. M at 316:3–8). Later during trial,

counsel told the court that the State had tried to locate John but that he was on a reservation somewhere—they weren't sure which one—"in a place where we can't touch him." (Ex. O at 550:14–25). Thus, this is not a case where the witness's absence was a surprise—Petitioner's counsel knew John was not going to be available to testify because John was hiding out on an Indian reservation where they were unable to find him. Petitioner offers no argument as to what else trial counsel or the State could have done to locate John and secure his appearance.[50] Petitioner's general allegations that John should have been subpoenaed, that neither trial counsel nor the prosecutor made any effort to secure John's appearance, and that trial counsel's failure to object to John's absence was clearly not in Petitioner's interest fall far from the threshold required to show deficient performance under *Strickland*. (Doc. 17 at 29–30, 56). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. As the Ninth Circuit has artfully explained: "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir.), *rev'd on other grounds*, 525 U.S. 141 (1998).

Further, Petitioner's counsel fought to have John's statements admitted through the

---

[50] The method for compelling attendance at trial is to serve the witness with a subpoena. A.R.S. § 13-4071(A); Ariz. R. Crim. P. 34(a). However, even if John had been found, it is not clear that the trial court would have been able to secure his attendance at trial. *See Tracy v. Superior Court of Maricopa Cty.*, 168 Ariz. 23, 37 (1991) ("Arizona courts lack jurisdiction to compel a Navajo witness located on the Navajo reservation to testify in a state court criminal proceeding without resort to the provisions of the Uniform Act. The Uniform Act is only operative where the other jurisdiction has enacted reciprocal legislation, as the Navajo Nation has done here."); *see also Maguire v. United States*, 396 F.2d 327, 330 (9th Cir. 1968) ("The Sixth Amendment does not require that the government be successful in trying to subpoena witnesses— all that is required is that the process issue and the Marshal exercise due diligence in a good faith attempt to secure service of the process.").
The Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, A.R.S. §§ 13-4091 to 13-4096, "is a provision to assist jurisdictions in conducting criminal prosecutions." *Tracy*, 168 Ariz. 23 at 37. "Either the prosecutor or the defendant may utilize the Uniform Act to procure the attendance of [] a witness . . . who resides beyond the subpoena power of the prosecuting state." *Id.* "[T]he Uniform Act does not extend the criminal jurisdiction of the requesting jurisdiction beyond its boundaries; rather, the Act's effectiveness depends on principles of comity and reciprocity in the courts of the jurisdiction where the witness resides." *Id.*

testimony of the witness police officers but was denied by the trial judge. During opening statements, counsel started to say that John spoke to Detective LaBenz, but the State objected and the court ruled that counsel could not mention John's statements in his opening because it was unclear whether the statements were going to come in at trial. (Ex. M at 316–18). Later in trial, the court gave counsel an opportunity to address hearsay issues. Petitioner's counsel told the court that during the interview with Detective LaBenz, "KJ repeatedly said that he saw Mr. Medina driving away from the scene." (Ex. O at 550:4–5). Counsel clarified that John first said he was knocked out and when he woke up Medina and the truck were gone, then later said Medina was driving. *Id.* at 552:15–18. John just said Medina was driving; he did not say from the scene. *Id.* at 553:1–2. Counsel noted that John later retracted the statement that Medina was driving and said he didn't remember making it, saying "you made me rat my friend out." *Id.* at 550:7–9. Counsel also noted that John was extremely drunk and combative at the time. *Id.* at 550:9–10. Counsel argued that because John was not available and reasonable efforts had been made to locate him, John's statements to Detective LaBenz should come in as an exception to the hearsay rule because they were "potentially material evidence" that Petitioner was not the driver at the time of the accident and therefore went to "the heart of the case." *Id.* at 550–53. The court ultimately ruled that John's statements could not come in just because he was unavailable, but that Petitioner's counsel might be able to use the statements if he could lay the foundation for an excited utterance or other hearsay exception. *Id.* at 564:13–565:5. Thus, in contrast to Petitioner's complaints that counsel did not act with Petitioner's interests in mind, the record reflects that counsel argued persistently to have John's statements come in via officer testimony as an exception to the hearsay rule. Counsel was therefore not ineffective for failing to secure John's presence at trial when he argued to have John's statements admitted; the statements, to the extent that they had value for the defense, would have likely been more valuable than John's testimony years after the incident (considering that John was unable to recall what happened just a few months after the incident).

In addition, while Petitioner alleges that John would have testified "to his direct

involvement and first hand knowledge to the events leading up to and throughout the fatal accident," Petitioner provides no evidence as to what John's testimony would have been or whether it would have been favorable to the defense. (Doc. 7 at 9); *see Grisby*, 130 F.3d at 373; *Ashimi*, 932 F.2d at 650. A review of the police reports Petitioner attaches to his PWHC confirms that John made inconsistent statements about what happened the night of the incident and what he remembered, and thus it is anyone's guess as to what John would have actually said on the witness stand. The police reports show the following:

On the night of the incident, Deputy Antwiler was dispatched to 96th and Pueblo and saw two men and a woman in the middle of the street. (Doc. 7-1 at 36). The men identified themselves with their Arizona identification cards as Medina and John. Both men were very intoxicated with slurred speech, stumbled while speaking, and easily lost their train of thought. John said they did not need the police and that Medina was not that badly hurt. John said he did not know how Medina got injured and that he walked up on him in that condition. John and Medina were anxious, agitated, and aggressive and were arrested for disorderly conduct. Antwiler noted that John and Medina were found about a half mile away from the fatal collision. Deputy Macklin was also on scene with Deputy Antwiler and noted that Medina and John appeared to be intoxicated and that John did not appear to be injured. (Doc. 7-1 at 39). Macklin and Antwiler tried to get information from Medina and John but they were evasive and would not answer questions.

Detective LaBenz interviewed John at the scene after he was placed in the cop car. (Doc. 7-1 at 42). John repeatedly stated that he didn't do anything and that he was trying to help his friend. He described getting into some kind of fight at the bowling alley earlier that night, then went to the bar, and then "I guess I left with a friend his name is Darrin he's fucked up though." *Id.* at 58:21. John clarified that he meant they were both drinking, and that when the cops got John someone let Medina go, and Medina went home. *Id.* at 59. When asked if they got pulled over or if anything happened, John said nothing happened and they were not pulled over. *Id.* at 60. He did not want Medina to take the blame for drinking and driving. John said Medina "took the truck and left" and John stayed. *Id.* at

61:14–17. John further said "a bunch of shit" happened that he didn't know how to explain, that he had been drinking and was trying to protect his friends, and that he stayed to take the blame for something. *Id.* at 62–63. John clarified that he meant the drinking and driving, and that Medina took off and John stayed. *Id.* at 64:8–11. John repeatedly denied knowing anything about an accident and said Medina was not hurt. *Id.* at 65–66. In his narrative report, LaBenz noted that John was "vague and argumentative through parts of the investigation, but seemed forthcoming during other parts" and "had conflicting statements." (Doc. 7-1 at 88). LaBenz provided a summary of John's record statements:

> John told me he had been bowling earlier in the night and witnessed a guy getting "jumped". He gave chase to the guys that "jumped" the other guy, but lost him in a neighborhood.
>
> He then told me about going to Spirits Bar with Darrin and some other people. He got a ride home from Darrin. He had a trouble recollecting what took place during the ride home. He stated that he stayed around to take the fall for something that happened. He said Darrin left in his truck.
>
> John made statements about blacking out, and other statements about taking responsibility for Darrin so he would not get in trouble. He repeatedly stated that he did not have any recollection of the events leading to the collision or why someone other than Darrin would be driving Darrin's truck. John had nothing further to add.

(Doc. 7-1 at 88).

Detective Luna interviewed John approximately three months after the incident. John stated that he remembered some of that night but not the end of it. (Doc. 7-1 at 31). John said Medina was driving them home from the bar and that a red car cut them off. *Id.* at 32. Medina and the driver of the red car got out and were fighting. John got out to see what was going on, was hit from behind with something, and fell to the ground and lost consciousness. When he woke up everyone was gone and the truck was gone. John started to walk home and came across the accident scene and saw Medina's truck was involved. He tried to get information from the deputies because he was worried about his friend but ended up getting arrested. John could not identify the driver of the red car and could not provide any additional information. He showed Detective Luna a scar on his back from

1    where he said he was hit.

2        Thus, while Petitioner alleges that John would have testified to his first-hand

3    knowledge about the incident, it is pure speculation as to what John would have actually

4    said or remembered at the time of trial. *Evans*, 285 F.3d at 377. Federal courts are not

5    forums in which to relitigate state trials[,]" *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983),

6    and "it is well settled that upon *habeas corpus* the court will not weigh the evidence." *Hyde*

7    *v. Shine*, 199 U.S. 62, 84 (1905). Given John's inconsistent statements to law enforcement

8    and inability to remember everything from the night in question, John's testimony could

9    have undermined the State's case or Petitioner's case—the Court can only speculate as to

10   what John's testimony might have been. Therefore, while the Court is not required to

11   consider prejudice because Petitioner has failed to show that counsel's performance was

12   deficient, the undersigned finds that even if John had testified at trial, Petitioner has not

13   shown a reasonable probability that John's testimony would have probably changed the

14   verdict.[51] *See Hurles v. Ryan*, 752 F.3d 768, 781–82 (9th Cir. 2014) (in capital case, counsel

15   was likely deficient for failing to investigate and locate a witness who could have provided

16   crucial insight into defendant's behavior and mental state, but defendant failed to "show a

17   reasonable probability that but for counsel's failure to track down the witness, the result of

18   the guilt phase would have been different"; because witness had not been found, court

19   could only speculate as to the nature of her testimony and whether it would have helped or

20   hurt defense; thus, defendant's "claim of prejudice amounts to mere speculation"); *Richter*,

21   131 S. Ct. at 792 (to establish *Strickland* prejudice, the likelihood of a different result must

22   be substantial, not just conceivable).

23       Accordingly, the state court's finding that Petitioner's IAC claim was without merit

24   is supported by the record before this Court and was not an objectively unreasonable

25   application of *Strickland*. The undersigned therefore recommends that the District Court

26   deny relief on Ground Two (c).

27

28   [51] In addition, as noted above, there was other strong evidence of Petitioner's guilt at trial, including the DNA evidence and eyewitness testimony placing Petitioner and his wife at the scene of the fatal accident. *See supra* notes 44 and 45.

iv.    Ground Two (d)

Petitioner alleges that trial counsel was ineffective for failing to request a limiting instruction on Petitioner's parole status. Petitioner presented this claim in his second PCR petition and in his petition for review to the COA, alleging in both pleadings that trial counsel was ineffective for failing to submit a limiting instruction on Petitioner's parole status. (Ex. QQ at 69–70; Ex. WW at 7). Accordingly, this claim is properly exhausted.

As noted above, the trial court found that Petitioner failed to state any colorable claims for relief under *Strickland* because Petitioner failed to show that counsel's performance was deficient or that the alleged deficiency prejudiced him. (Ex. UU at 173–74). In denying relief on Petitioner's petition for review, the Arizona COA did not specifically address Petitioner's IAC claims but found that Petitioner had failed to establish that the trial court abused its discretion in denying the Rule 32 petition. (Ex. DDD at 25). For purposes of federal habeas review, Petitioner bears the burden of showing that the post-conviction relief court, in ruling that trial counsel was not ineffective, applied *Strickland* in an objectively unreasonable manner. Here, the undersigned finds that the state court's finding that trial counsel was not ineffective for failing to request a limiting instruction on Petitioner's parole status is supported by the record before this Court and was not an unreasonable application of *Strickland*.

In affirming Petitioner's convictions and sentences on direct appeal, the COA provided a detailed explanation of how the parole evidence came to be admitted at trial. (Ex. DD at 1489–92). For brevity's sake, the Court will not repeat that full explanation here. The trial court ultimately ruled that the evidence was admissible as to Petitioner's motive for leaving the scene, in contradiction of the defense theory that Petitioner left due to medical necessity. (Ex. Q at 887–88). The court advised Petitioner's counsel that "it would consider certainly a jury instruction, cautionary instruction, limiting instruction if that's something [Petitioner] would be interested in." *Id.* at 88:6–9. On direct examination, Petitioner's wife, Shirley Chavez, testified that she drove Petitioner from the scene to the hospital because he was badly injured and she thought he was going to bleed to death. (Ex.

R at 912–16). Petitioner's counsel asked Ms. Chavez whether she was "deliberately trying to get Craig away from the accident scene because he was on parole at the time?" Ms. Chavez responded, "Didn't even cross my mind." *Id.* at 923:24–924:2. On cross-examination, the following exchange occurred:

> BY MR. SERDEN:
>
> Q. Now, your testimony was that you took him to the hospital because you were afraid he was going to bleed to death, correct?
>
> A. Yes.
>
> Q. Okay. And you've already told the jury that he was on parole, correct?
>
> A. No, I didn't tell anybody he was on parole.
>
> Q. Well, Mr. Conter asked you the question that he was on parole and you answered yes, he was?
>
> A. Well, then I did.
>
> Q. Okay. So is that a possible reason --
>
> A. Mr. Serden, you're getting me all confused and you're trying to put words into my mouth. I was scared for my husband's life. I picked him up. I put him in the car. No, I am not a nurse. No, I didn't see any other vehicles.

*Id.* at 942:1–16. The following day, the State called a parole supervisor from the Arizona Department of Corrections who testified that, at the time of the incident, Petitioner was on parole from a felony in Georgia. (Ex. S at 1092–94). The witness also testified that the terms of Petitioner's parole included not consuming alcohol, obeying all laws, and not engaging in any violent or criminal behaviors. *Id.* at 1095. The jury submitted two questions inquiring why Petitioner was on parole and both parties agreed it was irrelevant. The court then instructed the jury that the reason Petitioner was on parole was not an issue in the case and not something they should speculate about or needed to be concerned about. *Id.* at 1098–99. During closing arguments, Petitioner's counsel reiterated the argument that Ms. Chavez took Petitioner from the scene because he was injured, not because of concern that Petitioner might be violating his parole, and alleged that the State was "raising false

specters" about what happened. (Ex. V at 1220–22). In rebuttal, the State argued that Petitioner's parole status gave him motive to flee the scene of the accident when he could have stayed and waited for help. *Id.* at 1264–66; 1280.

Thus, with this background in mind, the question before the Court is not whether the parole evidence should have been admitted in the first place, but whether trial counsel was ineffective for failing to request a limiting instruction as to the proper use of that evidence. "In general, the decision not to request a limiting instruction is 'solidly within the acceptable range of strategic tactics employed by trial lawyers in the mitigation of damning evidence.'" *Musladin v. Lamarque*, 555 F.3d 830, 846 (9th Cir. 2009) (quoting *United States v. Gregory*, 74 F.3d 819, 823 (7th Cir. 1996)); *see also Pinkoson v. Davenport*, 2009 WL 2219285, at *5 (D. Ariz. July 24, 2009) ("Counsel's decisions regarding jury instructions are fairly construed as a strategic decision."). Arizona courts have recognized "the possible detriment to the defendant by singling out evidence of other offenses and giving a special instruction upon the subject." *State v. Hernandez*, 7 Ariz. App. 200, 205 (1968), *abrogation on other grounds recognized by State v. Harvill*, 106 Ariz. 386, 391 (1970). Thus, "[e]xperienced defense counsel may very well consider it good trial strategy to fail to ask for such an instruction or to object to such an instruction if proposed." *Id.*

Here, in rejecting the jurors' questions as to the nature of Petitioner's prior felony, the court instructed the jurors that it was irrelevant and not something they should speculate about because it was not part of the case. As Respondents argue, in light of the court's instruction, Petitioner's counsel may have determined that a limiting instruction was unnecessary given the court's response to the jurors' questions. Indeed, Petitioner does not propose a limiting instruction that would accomplish more than the court's instruction to the jurors. Alternatively, counsel may have thought that requesting an instruction would draw further attention to Petitioner's parole status and therefore did not pursue the matter. *See Gregory*, 74 F.3d at 823 ("If the lawyer cannot stop the evidence from being admitted, it is perfectly rational to decide not to draw further attention to it by requesting a motion

for limiting instruction."); *see also Posey v. Barnes*, 2012 WL 13206923, at *10 n.6 (N.D. Cal. Aug. 29, 2012) ("[O]nce the statement had been admitted, it was not unreasonable for defense counsel to forgo a limiting instruction that might have drawn more attention to [the] unfavorable testimony."); *Carignan v. Adams*, 2009 WL 6388374, at *10 (S.D. Cal. Oct. 21, 2009) (finding no error on counsel's failure to request a limiting instruction on parole status where asking for the instruction would have highlighted petitioner's criminal background and there was overwhelming evidence of guilt), *report and recommendation adopted*, 2010 WL 1709590 (S.D. Cal. Apr. 26, 2010). Thus, because the trial court made it clear that it would consider a limiting instruction if Petitioner's counsel requested one, counsel's decision not to make such a request was not a mistake but a considered decision. That Petitioner disagrees with counsel's decision does not make the decision wrong. "Under *Strickland*, counsel's representation must be only objectively reasonable, not flawless or to the highest degree of skill." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000); *see also Yarborough*, 540 U.S. at 8 ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.").

Further, regardless of whether counsel was deficient for failing to request a limiting instruction, Petitioner has failed to establish prejudice. *See Butcher v. Marquez*, 758 F.2d 373, 377 (9th Cir. 1985) (where petitioner failed to prove that counsel erred in failing to request an instruction "and that the error was one that a reasonably competent attorney acting as a diligent conscientious advocate would not have made," court need not consider prejudice). After the court ruled that the parole evidence was admissible, Petitioner's counsel "drew the sting" by soliciting the testimony from Shirley Chavez on direct examination. While the State's theory was that Petitioner's parole status gave him motive to flee the scene, Defense counsel used Ms. Chavez's testimony to bolster the defense theory that Petitioner left due to a medical emergency—that Ms. Chavez was so concerned for her husband's life that all she could think about was getting him to the hospital as quickly as possible. Thus, even if defense counsel had requested a limiting instruction, and the court had given one, the jury would still have two theories before it

positing different reasons why Petitioner left the scene of the accident. Motive for leaving the scene was not an element of the charges, and as discussed throughout this opinion, the evidence before the jury was sufficient to support Petitioner's conviction regardless of his reason for leaving the scene. Especially in light of the court's instruction to the jury that the nature of Petitioner's underlying felony was irrelevant, it is not reasonably probable that a result more favorable to Petitioner would have been reached if trial counsel had requested the limiting instruction. *See Eppard v. Janda*, 2013 WL 1401216, at *11 (C.D. Cal. Mar. 4, 2013) ("To prevail on a claim of ineffective assistance for failure to request an instruction, a petitioner must establish that the failure to request the instruction fell below an objective standard of reasonableness and that a reasonable probability exists that had the request been made, it would have been granted and the result of the trial would have been different."). The fact that no juror questions regarding Petitioner's parole status were raised during jury deliberations is evidence that the jurors followed the court's instructions and further underscores the lack of prejudice on this issue.

Accordingly, the state court's finding that Petitioner's IAC claim was without merit is supported by the record before this Court and was not an objectively unreasonable application of *Strickland*. The undersigned therefore recommends that the District Court deny relief on Ground Two (d).

v.     Ground Six

Petitioner alleges that appellate counsel was ineffective for failing to raise and preserve the cognizable issues of prosecutorial misconduct, sufficiency of the evidence, and double punishment/consecutive sentences, thereby "depriving fundamental preservation and exhaustion." (Doc. 7 at 25). Petitioner does not elaborate as to what specific arguments counsel should have raised in relation to these issues on direct appeal.

In his second PCR petition, Petitioner alleged that appellate counsel was ineffective for failing to raise appealable issues and that counsel had only raised the parole status limiting instruction claim. (Ex. QQ at 70–71). Petitioner specifically argued that appellate counsel should have raised claims regarding: (a) denial of a fair trial; (b) insufficient

evidence to support the verdict; (c) denial of compulsory process because Laughlin, Steiner, and John were absent from trial; (d) prosecutorial misconduct for withholding the recording of Laughlin's 911 call, vouching for officers' mistakes as excusable and stating the defense presented a smoke and mirrors case, repeatedly referring to Petitioner's parole status in rebuttal closing arguments, and failing to investigate Medina's injuries and submit photographs; (e) loss of presumption of innocence from photographs showing Petitioner handcuffed and in a neck brace; and (f) the trial court sentenced Petitioner to multiple punishments under a single prosecution when concurrent terms should have been imposed. In his petition for review to the COA, Petitioner asserted ineffective assistance of appellate counsel for failing to raise all colorable claims: (a) denial of a fair trial; (b) insufficient evidence to support the verdict; (c) violation of compulsory process; (d) prosecutorial misconduct for perjury and vouching; (d) loss of presumption of innocence; and (e) double punishment. (Ex. WW at 7). Thus, the undersigned finds that Petitioner has properly exhausted the claims he now raises on habeas—that appellate counsel was ineffective for failing to raise claims of prosecutorial misconduct, sufficiency of the evidence, and double punishment/consecutive sentences.

As noted above, the trial court found that Petitioner failed to state any colorable claims for relief under *Strickland* because Petitioner failed to show that counsel's performance was deficient or that the alleged deficiency prejudiced him. (Ex. UU at 173– 74). In denying relief on Petitioner's petition for review, the Arizona COA did not specifically address Petitioner's IAC claims but found that Petitioner had failed to establish that the trial court abused its discretion in denying the Rule 32 petition. (Ex. DDD at 25). For purposes of federal habeas review, Petitioner bears the burden of showing that the post-conviction relief court, in ruling that appellate counsel was not ineffective, applied *Strickland* in an objectively unreasonable manner. Here, the undersigned finds that the state court's finding that appellate counsel was not ineffective for failing to raise additional claims on direct appeal is supported by the record before this Court and was not an unreasonable application of *Strickland*.

The Supreme Court, "in holding that a State must provide counsel for an indigent appellant on his first appeal as of right, [has] recognized the superior ability of trained counsel in the 'examination into the record, research of the law, and marshalling of arguments on [the appellant's] behalf.'" *Jones*, 463 U.S. at 751 (second alteration in original) (quoting *Douglas v. California*, 372 U.S. 353, 358 (1963)); *see also United States v. Ricks*, 810 F.2d 195 (4th Cir. 1987) ("Decisions by appellate counsel concerning which legal issues will be presented on appeal are 'uniquely within the lawyer's skill and competence, and their resolution is ultimately left to his judgment.'" (quoting *Cerbo v. Fauver*, 616 F.2d 714, 718 (3d Cir.), *cert. denied*, 449 U.S. 858 (1980))). "There is no constitutional requirement that an advocate argue every issue on appeal, or that he present those chosen by the defendant. The determination of the issues to be raised in the appellate court is a matter which addresses itself to the sound discretion of the advocate." *State v. Jesperson*, 1997 WL 39501, at *2 (Tenn. Crim. App. Jan. 28, 1997) (citing *Jones*, 463 U.S. at 750–51). "There is no requirement that an attorney appeal issues that are clearly untenable[, and c]ounsel need not appeal every possible question of law at the risk of being found to be ineffective." *Gustave*, 627 F.2d at 906. Thus, the question of what claims should be raised in the appellate court is left to the sound discretion of appellate counsel.

Here, while Petitioner argues appellate counsel was ineffective for failing to raise issues of prosecutorial misconduct, sufficiency of the evidence, and double punishment, Petitioner does not provide further detail as to what these claims should have been. *See Greenway v. Schriro*, 653 F.3d 790, 804 (9th Cir. 2011) ("cursory and vague claim cannot support habeas relief"). Petitioner alleges that he sent appellate counsel a 13-page letter of issues that he wanted her to raise and that counsel dismissed it and sent it back, talking to him in a disrespectful manner. (Doc. 17 at 39–40). Petitioner further alleges that appellate counsel told him he could raise the issues, including prosecutorial misconduct, in the Rule 32 petition. *Id.* The record reflects that appellate counsel's letter to Petitioner stated that Petitioner's complaints about discovery were not issues for appeal as long as trial counsel received the discovery, even if Petitioner did not personally see every document, but that

if Petitioner was complaining that trial counsel did not provide him with copies of documents, Petitioner could raise the IAC claim in a Rule 32 petition. (Ex. MMM at 97). The letter also stated:

> Unless there was some proper objection or motion regarding the absence of certain witnesses from trial, that is not going to be an issue. After the appeal, if you begin a Rule 32 proceeding, you can discuss whether their absence was improperly obtained, whose fault that was, and whether they have anything to say that would have changed the verdict. That is also the only avenue for your complaints about introduction of evidence on toxicology.

*Id.* at 98. Thus, appellate counsel's letter to Petitioner advised that some claims could not be properly raised on direct appeal, but that Petitioner could pursue those claims on PCR. While Petitioner may disagree with appellate counsel's evaluation of the issues, an "attorney need not advance every argument, regardless of merit, urged by the appellant." *Evitts*, 469 U.S. at 394.

Petitioner further contends that appellate counsel could have raised two or three of the many prosecutorial misconduct issues and "while they might not have been constitutional violations individually, taken as a whole the misconduct should have been viewed as cumulative[,] where taken together [they] may have amounted to reversible error." (Doc. 17 at 40). But the Court's inquiry is not what counsel could have done, but whether the decisions counsel made were reasonable. *Babbit*, 151 F.3d at 1173. That Petitioner disagrees with appellate counsel's decision to only raise the parole status limiting instruction claim does not make counsel ineffective for failing to raise issues that counsel, in exercising her discretion, reasonably determined should not be presented. *Gustave*, 627 F.2d at 906; *Jesperson*, 1997 WL 39501, at *2. Counsel may have reasoned that there were no other viable claims for appeal, or that the limiting instruction claim was the strongest argument and thus the issue most likely to result in having Petitioner's convictions overturned. "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Yarborough*, 540 U.S. at 8. "That presumption has particular force where a petitioner bases

his ineffective-assistance claim solely on the trial record, creating a situation in which a court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive." *Id.* (internal quotations and citation omitted). "Moreover, even if an omission is inadvertent, relief is not automatic. The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Id.* Petitioner's bold assertion that the ignored issues are clearly stronger than the issue counsel did present is wholly insufficient to show that appellate counsel acted below an objective standard of reasonableness under prevailing professional norms. (Doc. 17 at 40); *Strickland*, 466 U.S. at 687–88.

Accordingly, the state court's finding that Petitioner's ineffective assistance of appellate counsel claim was without merit is supported by the record before this Court and was not an objectively unreasonable application of *Strickland*. Petitioner has not established that appellate counsel's performance was constitutionally deficient; thus, the Court need not consider prejudice. *Strickland*, 466 U.S. at 697–700; *LaGrand*, 133 F.3d at 1270. The undersigned therefore recommends that the District Court deny relief on Ground Six.

### E.  Request for Discovery and Evidentiary Hearing

Petitioner requests discovery under Rule 6 and alleges that it is the duty of the Court to provide the necessary procedures for an adequate inquiry. (Doc. 17 at 10; 74–75). Petitioner also requests an evidentiary hearing under Rule 8 stating that because no evidentiary hearing was held in state court, he is entitled to one in federal court if he alleges facts that, if proved, would entitle him to relief. *Id.* at 11–12.

a.  Discovery

A habeas petitioner is not entitled to discovery "as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *see Campbell v. Blodgett*, 982 F.2d 1356, 1358 (9th Cir. 1993). "Rather, discovery is available only in the discretion of the court and for good cause shown." *Rich v. Calderon*, 187 F.3d 1064, 1068 (9th Cir. 1999); *see* Rule 6(a), Rules Governing § 2254 Cases. Whether a petitioner has established "good cause"

1    for discovery requires the court to determine the essential elements of the petitioner's

2    substantive claim and evaluate whether "specific allegations before the court show reason

3    to believe that the petitioner may, if the facts are fully developed, be able to demonstrate

4    that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09.

5         Here, the undersigned finds that Petitioner has not shown good cause for the

6    requested discovery. Petitioner requests transcripts of the proceedings that Respondents

7    noted they did not have transcripts for because "he feels they relate to the true cause of

8    [his] conviction and support the actual innocence claim to the fullest," and specifically asks

9    the Court to order Respondents to furnish everything related to probable cause, the grand

10   jury proceedings, and the indictments. (Doc. 17 at 2; *see also id.* at 3–5, 11).[52] Petitioner

11   contends that Detective LaBenz committed perjury when he told the grand jury that

12   Kendrick John never made a statement to law enforcement, but that the record shows

13   LaBenz interviewed John shortly after the accident; therefore, the April 13, 2012 grand

14   jury records relate to Petitioner's claim of actual innocence. *Id.* at 5. However, despite

15   Petitioner's repeated assertions of "evidence" to support a biased and perjured grand jury

16   indictment, Petitioner's allegations amount to no more than speculation.[53] As discussed

17   previously in this Report and Recommendation, John's statements to the police right after

18   the accident and in the months that followed were contradictory, and though they may have

19   cast some doubt on the State's theory at trial, it is wholly unknown what John might have

20   actually testified to.[54] Petitioner's efforts to reconstruct the facts and offer an alternative

21   _____

22   [52] Some of the documents Petitioner requests include notice of defenses and rebuttal witnesses, preliminary jury instructions, and the stipulations of Petitioner's and Medina's injuries. Petitioner fails to show why the requested documents are necessary.

23   [53] To the extent that Petitioner argues that LaBenz falsely testified at trial about what John

24   said to him, that contention is belied by the record. On cross-examination, LaBenz stated that when he spoke with John while John was detained in the back of the patrol car, John

25   did not connect anything with the accident. (Ex. P at 752:1–4). LaBenz's testimony is supported by the transcript of that interview, where John repeatedly denied knowing anything about an accident and said Medina was not hurt. (Doc. 7-1 at 65–66).

26   [54] Moreover, the Maricopa County Superior Court docket and index of record both reflect that after the original indictment issued on April 13, 2012, (Ex. TTT at 242; Ex. UUU at

27   244), Petitioner's counsel filed a motion to remand for a new finding of probable cause, (Ex. UUU at 245). The court granted the motion and a new indictment issued on August

28   12, 2012. (Ex. TTT at 240–41; Ex. UUU at 245). Thus, in light of the remand indictment, the original April 13, 2012 indictment is irrelevant.

- 73 -

1   interpretation of the evidence are insufficient to persuade the Court that discovery is

2   warranted.[55]

3          The Ninth Circuit has explained that "discovery is only available in the discretion

4   of the court and for good cause shown" and is not "meant to be a fishing expedition for

5   habeas petitioners to explore their case in search of its existence." *Rich*, 187 F.3d at 1067–

6   68 (internal quotation marks omitted); *see also Strickler v. Greene*, 527 U.S. 263, 286

7   (1999) ("Mere speculation that some exculpatory material may have been withheld is

8   unlikely to establish good cause for a discovery request on collateral review."); *Thomas v.*

9   *United States*, 849 F.3d 669, 681 (6th Cir. 2017) ("Bald assertions and conclusory

10  allegations do not provide sufficient ground to warrant requiring the government to respond

11  to discovery or to require an evidentiary hearing."). As explained above, the undersigned

12  finds that Petitioner's claims can be resolved on the state court record and should be denied;

13  evidentiary development is therefore unnecessary. Further, as discussed in the section

14  below, *Pinholster* limits this Court's review to the record that was before the state court

15  and thus forecloses Petitioner's request for discovery. *See Runningeagle*, 686 F.3d at 773

16  (petitioner was not entitled to discovery, expansion of the record, or an evidentiary hearing

17  where his claim was governed by § 2254(d)(1)); *Kemp v. Ryan*, 638 F.3d 1245, 1258–60

18  (9th Cir. 2011) (if AEDPA bars a petitioner from having an evidentiary hearing, the

19  petitioner could necessarily not show "good cause" for discovery under Rule 6); *Prentice*

20  *v. Baker*, 2013 WL 1182065, at *2 (D. Nev. Mar. 19, 2013) (The court "may consider the

21  likely futility of the discovery where federal review, as recognized in *Cullen v. Pinholster*,

22  131 S. Ct. 1388 (2011), is limited under 28 U.S.C. § 2254(d)(1) to the record before the

23  state court that adjudicated the claim on the merits.").[56]

---

24  [55] Petitioner also alleges that some of the dates of the state court proceedings are unknown
25  to him and false. Respondents' Answer incorrectly lists the date of the grand jury
    proceedings for the original indictment as April 13, 2013, and the proceedings for the
26  remand indictment as August 19, 2013. *See* Doc. 14 at 5. The original indictment issued
    April 13, 2012 and the remand indictment issued August 20, 2012. *See* Exs. A and D.
27  [56] Pursuant to Rule 5 of the Rules Governing § 2254 Cases, the respondent is required to
    list in the answer what transcripts are available and what proceedings were recorded but
28  not transcribed. The respondent is also required to attach to the answer parts of the
    transcript that the respondent considers relevant. The judge may order the respondent to
    provide other transcripts or to have untranscribed proceedings transcribed. Thus, while the

1          b.  Evidentiary Hearing

2          The decision whether to grant an evidentiary hearing is generally left to the sound

3    discretion of the district court, subject to the requirements of AEDPA. *Schriro v.*

4    *Landrigan*, 550 U.S. 465, 473 (2007) (citing *Townsend v. Sain*, 372 U.S. 293, 313 (1963),

5    and noting that its pre-AEDPA basic rule has not changed). Pursuant to Rule 8(a) of the

6    Rules Governing § 2254 Cases, "the judge must review the answer [and] any transcripts

7    and records of state-court proceedings . . . to determine whether an evidentiary hearing is

8    warranted." As an initial matter, the court should not conduct an evidentiary hearing on a

9    petitioner's claim if the state court adjudicated the claim on the merits. *Pinholster*, 563

10   U.S. at 181 (holding that "review under § 2254(d)(1) is limited to the record that was before

11   the state court that adjudicated the claim on the merits"); *see also Murray*, 745 F.3d at 1001

12   (*Pinholster* applies to review under § 2254(d)(2)). This bar may be lifted, however, if the

13   state court's adjudication of the claim was contrary to or an unreasonable application of

14   clearly established Supreme Court law, *Johnson v. Finn*, 665 F.3d 1063, 1069 n.1 (9th Cir.

15   2011), or if the state court's decision was based on an unreasonable determination of the

16   facts, *Maxwell v. Roe*, 628 F.3d 486, 506 (9th Cir. 2010).[57]

17   _____

     Court has discretion to order Respondents to furnish additional transcripts, the undersigned
18   finds that doing so is unnecessary and would not aid the Court's decision in this matter.
     [57] If the state court did not adjudicate the claim on the merits, then the *Pinholster* rule has
19   no application. 563 U.S. at 186 ("[N]ot all federal habeas claims by state prisoners fall
     within the scope of § 2254(d), which applies only to claims 'adjudicated on the merits in
20   State court proceedings.' At a minimum, therefore, § 2254(e)(2) still restricts the discretion
     of federal habeas courts to consider new evidence when deciding claims that were not
21   adjudicated on the merits in state court."). However, pursuant to § 2254(e)(2), the Court
     may not hold a hearing unless it first determines that the petitioner exercised diligence in
22   trying to develop the factual basis of the claim in state court. *Williams v. Taylor*, 529 U.S.
     420, 432 (2000).
23       The diligence assessment requires a determination of whether a petitioner "made a
     reasonable attempt, in light of the information available at the time, to investigate and
24   pursue claims in state court." *Id.* at 435. Absent unusual circumstances, diligence requires
     that a petitioner "at a minimum, seek an evidentiary hearing in state court in the manner
25   prescribed by state law." *Id.* at 437; *see also Rhoades v. Henry*, 598 F.3d 511, 517 (9th Cir.
     2010) ("a petitioner who 'knew of the existence of [ ] information' at the time of his state
26   court proceedings, but did not present it until federal habeas proceedings, 'failed to develop
     the factual basis for his claim diligently'" (quoting *Cooper-Smith v. Palmateer*, 397 F.3d
27   1236, 1241 (9th Cir. 2005))). A petitioner's attorney's fault is generally attributed to the
     petitioner for purposes of § 2254(e)(2)'s diligence requirement. *Dickens v. Ryan*, 740 F.3d
28   1302, 1321 (9th Cir. 2014).
         If the failure to develop a claim's factual basis is attributable to the petitioner, a
     federal court may hold an evidentiary hearing only if the claim relies on (1) "a new rule of

1   Here, as in *Pinholster*, § 2254(d) applies to Petitioner's IAC claims addressed in

2   Section D above because the claims were adjudicated by the state court on the merits. *See*

3   *Pinholster*, 563 U.S. at 187–88 (explaining that § 2254(d) "applies even where there has

4   been a summary denial" and in such circumstances the "'habeas court must determine what

5   arguments or theories . . . could have supporte[d] the state court's decision; and then it must

6   ask whether it is possible fairminded jurists could disagree that those arguments or theories

7   are inconsistent with the holding in a prior decision of [the Supreme] Court.'" (first

8   alteration in original) (quoting *Richter*, 562 U.S. at 102)). This Court's review is thus

9   limited to whether the state court unreasonably applied *Strickland's* clearly established

10  federal law to Petitioner's IAC claims. *See* § 2254(d)(1). Under this Court's "doubly

11  deferential" standard of review, Petitioner must therefore "demonstrate that it was

12  necessarily unreasonable for the [state court] to conclude: (1) that he had not overcome the

13  strong presumption of [counsel's] competence; and (2) that he had failed to undermine

14  confidence in the jury's [verdict]." *Pinholster*, 563 U.S. at 190. As discussed above, the

15  undersigned finds that Petitioner has failed to make this showing. To the extent that

16  Petitioner argues this Court should hold an evidentiary hearing and consider additional

---

18  constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable;" or (2) "a factual predicate that could not have been

19  previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A). In addition, "the facts underlying the claim [must] be sufficient to establish by clear and

20  convincing evidence that but for constitutional error, no reasonable fact finder would have found the [petitioner] guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B).

21      If a petitioner has diligently pursued his claim in state court, the district court may then consider whether an evidentiary hearing is appropriate or required under the factors

22  set forth in *Townsend*, 372 U.S. at 313. *See Earp v. Ornoski*, 431 F.3d 1158, 1166–67 (9th Cir. 2005); *Insyxiengmay v. Morgan*, 403 F.3d 657, 669–70 (9th Cir. 2005). If one of the

23  *Townsend* factors is met, the court may grant an evidentiary hearing if the petitioner's factual allegations, if proved, would entitle him to relief under AEDPA's deferential review

24  standards. *See Landrigan*, 550 U.S. at 474. Stated another way, "[i]f the defendant can establish any one of those circumstances [in *Townsend*], then the state court's decision was

25  based on an unreasonable determination of the facts and the federal court can independently review the merits of that decision by conducting an evidentiary hearing." *Earp*, 431 F.3d at 1167.

26      Finally, if the petitioner's claim can be resolved on the existing record, a federal evidentiary hearing is unnecessary. *Landrigan*, 550 U.S. at 474. Nor will a hearing be

27  granted "[i]n the absence of anything more concrete than the speculation—present in every case—that new evidence *might* exist." *United States v. Zuno-Arce*, 209 F.3d 1095, 1103

28  (9th Cir. 2000), *overruled on other grounds by Valerio v. Crawford*, 306 F.3d 742 (9th Cir. 2002).

1    evidence before ruling on the merits of his IAC claims, that argument is wholly foreclosed

2    by *Pinholster's* holding that this Court's review under § 2254(d)(1) is limited to the record

3    that was before the state court. 563 U.S. at 181. As the Supreme Court explained:

> Section 2254(d)(1) refers, in the past tense, to a state-court
> adjudication that "resulted in" a decision that was contrary to,
> or "involved" an unreasonable application of, established law.
> This backward-looking language requires an examination of
> the state-court decision at the time it was made. It follows that
> the record under review is limited to the record in existence at
> that same time *i.e.*, the record before the state court.

*Id.* at 181–82. The Court further observed that "[i]t would be strange to ask federal courts

to analyze whether a state court's adjudication resulted in a decision that unreasonably

applied federal law to facts not before the state court." *Id.* at 182–83; *see also id.* at 182

("It would be contrary to [§ 2254(b)'s exhaustion requirement] to allow a petitioner to

overcome an adverse state-court decision with new evidence introduced in a federal habeas

court and reviewed by that court in the first instance effectively *de novo*."). Accordingly,

the undersigned finds that *Pinholster* precludes this Court from holding an evidentiary

hearing on Petitioner's IAC claims. *See id.* at 187 n.11 ("Pinholster has failed to show that

the California Supreme Court unreasonably applied clearly established federal law on the

record before that court, which brings our analysis to an end. Even if the evidence adduced

in the District Court additionally supports his claim, as Pinholster contends, we are

precluded from considering it." (citations omitted)).[58]

---

[58] Even if *Pinholster* did not foreclose Petitioner's request for an evidentiary hearing, the undersigned further finds that Petitioner is not entitled to such a hearing. *See West v. Ryan*, 608 F.3d 477 (9th Cir. 2010) (holding that although petitioner was diligent in pursing claims in state court, petitioner failed to raise a colorable claim that counsel's performance fell below an objective standard of reasonableness; therefore, district court did not abuse its discretion in denying claim without holding an evidentiary hearing).

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Landrigan*, 550 U.S. at 474. However, "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*; *see also Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998). As explained above, Petitioner has not demonstrated that trial or appellate counsel's performance fell below an objective standard of reasonableness. Thus, the state court's determination that Petitioner failed to raise a colorable claim of IAC was not objectively unreasonable. Accordingly, the undersigned finds that "there is nothing to be determined in an evidentiary hearing" because Petitioner could not develop a factual record that would entitle him to habeas relief.

1    **IV.    RECOMMENDATION**

2          In conclusion, the Magistrate Judge **RECOMMENDS** that the District Court

3    **DENY** Petitioner Craig Justice's Petition for Writ of Habeas Corpus. (Doc. 7).

4          Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections

5    within fourteen days after being served with a copy of this Report and Recommendation.

6    A party may respond to another party's objections within fourteen days after being served

7    with a copy thereof. Fed. R. Civ. P. 72(b). No reply to any response shall be filed. *See id*.

8    If objections are not timely filed, then the parties' rights to de novo review by the District

9    Court may be deemed waived. *See United States* v. *Reyna-Tapia*, 328 F.3d 1114, 1121 (9th

10   Cir. 2003) (en banc).

11         Dated this 21st day of December, 2020.

12

13

14   _____

15   Eric J. Markovich
     United States Magistrate Judge

16

17

18

19

20

21

22

23

24   *West*, 608 F.3d at 490 (holding that where record, "viewed through the deferential lenses
     of AEDPA and *Strickland*," did not support petitioner's IAC claim, and petitioner "pointed
25   to no potentially powerful mitigating evidence that counsel overlooked or failed to develop,
     nor has he alleged facts that, if decided in his favor, would establish a colorable claim under
26   the first prong of *Strickland*[,] . . . there [was] nothing to be determined in an evidentiary
     hearing, and the district court did not abuse its discretion by denying his claim without
27   one"); *Landrigan*, 550 U.S. at 474; *see also Pinholster*, 563 U.S. at 186 ("Provisions like
     §§ 2254(d)(1) and (e)(2) ensure that '[f]ederal courts sitting in habeas are not an alternative
28   forum for trying facts and issues which a prisoner made insufficient effort to pursue in state
     proceedings.'" (quoting *Williams*, 529 U.S. at 437)).